No. 2-24-0350
Order filed March 10, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1)

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| NORTH SHORE GAS COMPANY and THE PEOPLES GAS LIGHT AND COKE COMPANY, | ) ) ) ) | On Petition for Administrative Review from the Illinois Commerce Commission. |
| Petitioners-Appellants, | ) ) | |
| v. | ) ) | ICC Case Nos.      23-0068 |
| THE ILLINOIS COMMERCE COMMISSION and the People *ex rel.* Kwame Raoul, Attorney General of the State of Illinois, | ) ) ) ) | 23-0069 |
| Respondents-Appellees. | ) ) ) | |

JUSTICE JORGENSEN delivered the judgment of the court.
Justice Birkett concurred in the judgment.
Justice Hutchinson specially concurred.

**ORDER**

¶ 1   *Held*: Agency did not err in disallowing certain amounts for gas utilities' safety modernization program, new shops and facilities, sewer replacement project, and rate case expense. However, agency's mandate that the utilities file long-term gas infrastructure plans is vacated for being outside its authority. Affirmed in part and vacated in part.

¶ 2   Petitioners, North Shore Gas Company (North Shore) and The Peoples Gas Light and Coke

Company (Peoples Gas) (collectively, the Companies), petitioned for direct administrative review

of the Illinois Commerce Commission's (Commission's) final order and order on rehearing in their rate cases. Ill. S. Ct. R. 335 (eff. Jul. 1, 2017) (direct review of administrative orders by appellate court). Peoples Gas challenges: (1) the Commission's decision on rehearing that disallowed certain amounts in its safety modernization program budget; and (2) the Commission's disallowance of funds for new shops and facilities. North Shore appeals the Commission's disallowance of certain amounts for its: (1) Clavey Road project; and (2) rate case expense. Finally, the Companies appeal the Commission's directive to file long-term gas infrastructure plans. We affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4     North Shore is a wholly-owned indirect subsidiary of WEC Energy Group, Inc., and is engaged in transporting, purchasing, distributing, and selling natural gas at retail to over 160,000 customers in Chicago's northern suburbs. Peoples Gas is also a wholly-owned indirect subsidiary of WEC and is engaged in transporting, purchasing, storing, distributing, and selling natural gas at retail to over 873,000 customers within the City of Chicago.

¶ 5     The Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2022)) defines the Commission's powers and duties in setting the rates a public utility may charge its customers. A public utility is entitled to recover certain operating costs through the rates that it charges its customers. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995). Generally, a utility seeking a rate increase must file new schedules or supplements with the Commission that indicate the proposed changes to be made in the schedule or schedules already in place, as well as the time when the proposed changes would take effect. 220 ILCS 5/9-201(a) (West 2022). "When a utility files a request for a rate increase in the form of a new tariff schedule, the Commission has the authority upon complaint or its own initiative to hear evidence, hold

hearings and determine the propriety of the requested increase." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991); 220 ILCS 5/9-201(b) (West 2022).

¶ 6    In January 2023, the Companies each separately filed with the Commission revised tariff sheets from their schedule of rates for gas service, proposing general increases in gas service rates (58.10% for Peoples Gas and 19.57% for North Shore) and revisions to service classifications, riders, and terms and conditions of service, effective on February 20, 2023.[1]  *Id.* § 9-201.  The Commission suspended the Companies' rate changes pending a hearing, and the dockets were consolidated (North Shore docket No. 23-0068; Peoples Gas docket No. 23-0069).  *Id.* (a rate case is initiated when a utility files tariffs providing for a rate increase and the Commission suspends those tariffs to conduct an investigation and hearing).  Commission staff participated in the proceedings, the Office of the Illinois Attorney General and the City of Chicago filed appearances, and various entities intervened in the proceedings.[2]  An evidentiary hearing commenced on August 10, 2023.

---

[1]As to the rate increases, the Commission ultimately, on November 16, 2023, approved a 43.24% rate increase for Peoples Gas and an 11.58% rate increase for North Shore.

[2]The entities included AARP, the Building Owners and Managers Association of Chicago, the Citizens Utility Board, Community Organizing and Family Issues, the Environmental Defense Fund, the Environmental Law and Policy Center, Gas Workers Union Local 18007, Utility Workers Union of America, AFL-CIO, the Illinois State Public Interest Research Group, Inc., Legal Action Chicago, Local 2285, International Brotherhood of Electrical Workers, the Natural Resources Defense Fund, the People for Community Recovery, and the Retail Energy Supply Association.

¶ 7          A. Safety Modernization Program[3] (SMP) Investment (Peoples Gas)

¶ 8               1. Proceedings Leading to Commission's Final Order

¶ 9     Peoples Gas sought to add $265 million to its rate base to fund its Safety Modernization Program (SMP). The SMP's purpose was to accelerate the pace of replacing aging at-risk components of the company's natural gas delivery system, specifically, the replacement of leaking and at-risk cast iron (CI) and ductile iron (DI) main with plastic pipe and upgrading the aging low-pressure system to medium pressure.[4]

¶ 10    The Commission reviewed and approved the SMP as recently as 2018, following an independent engineering audit it ordered be conducted by Kiefner & Associates, which recommended that Peoples Gas replace all CI/DI pipes by 2030. Several public interest organizations[5] recommended that the Commission order a new SMP investigation, require Peoples Gas to develop and propose a metric that assesses SMP risk reduction, direct the company to pause

---

[3]The record also refers to the program as the System Modernization Program.

[4]An independent engineering auditor recommended that Peoples Gas replace all cast iron and ductile iron pipes by 2023, and the legislature authorized separate funding for SMP-type costs for such replacement under the rider Qualified Investment Plant (QIP) statute that sunset on December 31, 2023, (220 ILCS 5/9-220.3(b)(1)-(7) (West 2022)), subject to later reconciliation proceedings before the Commission (220 ILCS 5/9-220.3(e)(2) (West 2022)). The company sought to recover 2024 SMP costs in the present case.

[5]They included the Environmental Defense Fund, the Environmental Law and Policy Center, the Illinois State Public Interest Research Group, Inc., and the Natural Resources Defense Fund (collectively, public interest organizations).

medium-pressure upgrades until after the investigation, and disallow SMP costs for facilities that would not be placed in service in 2024.

¶ 11    On November 16, 2023, the Commission ordered Peoples Gas to stop SMP work, initiated an investigation (on a separate docket), and removed the forecasted $265 million investment from the rate base.  It noted that, in explaining its reasoning for the project, Peoples Gas referred to a schedule it had filed that stated it sought to maintain safety and reliability, its SMP was most recently approved in an earlier docket (No. 16-0376), and it was supported by a 2020 engineering study by an outside auditor (docket No. 18-1092).  The Commission also noted that, when asked what alternatives were considered, the company had responded "Not Applicable" and stated the Commission had approved its approach in the earlier two dockets, which recommended continuing accelerated replacement of the pipe mains in the company's distribution system.  The Commission next stated that, in docket No. 16-0376, it approved Peoples Gas's neighborhood approach but stated therein that it made no determination regarding the prudence and reasonableness of costs incurred by the company in carrying out the SMP and would determine such factors in subsequent reconciliation proceedings or a future rate case.  It also noted that the legal framework that provided the company with concurrent cost recovery for all aspects of the SMP over the past decade had changed and that the relevant statute would soon sunset.  Thus, the present docket was the Commission's first comprehensive assessment of the reasonableness and prudence of SMP costs after its decisions in docket Nos. 16-0376 and 18-1092.

¶ 12    The Commission found that, after 12 years of work, Peoples Gas had completed about 35% of the SMP (as of October 2022).  The Commission noted that, since its 2018 decision in docket No. 16-0376, Peoples Gas used a neighborhood-by-neighborhood approach to implement the SMP.  "Given the risks posed by the CI/DI pipe remaining within [Peoples Gas's] distribution

2026 IL App (2d) 240350-U

system, the Commission is concerned with [Peoples Gas's] management of this project overall and its prioritization of pipeline replacement." It noted that the company referenced an eight-year-old study that estimated potential completion dates of 2030 and 2040, as well as docket No. 16-0376, wherein the company provided overall completion target dates of 2035 to 2040. Peoples Gas, the Commission further noted, had also referenced docket No. 18-1092 and a 2018 engineering review (the Kiefner Study) of its pipeline system, which identified a timeline for the company to retire all existing CI/DI pipe and recommended that all such pipes be replaced by 2030. The Kiefner Study also recommended that pipeline replacement efforts be accelerated because more than 80% of the remaining CI and DI pipes in Peoples Gas's system had a remaining life of less than 15 years, with most of the remaining CI mains averaging over 90 years old and most of the DI mains averaging over 50 years old. The Commission noted that the Kiefner Study concluded that the replacement rate had not been fast enough to compensate for the increase in failure rates expected from the aging system. The study "is the primary authority on prioritizing [Peoples Gas's] CI/DI retirement, and it recommended (in 2020) that [Peoples' Gas] accelerate its efforts to retire CI/DI by 2030."

¶ 13   Further, the Commission determined that the record lacked sufficient detail regarding the pipeline replacement to find that the company's SMP 2024 test year[6] investments were prudent

---

[6]The Illinois Administrative Code provides that a utility's revenue requirement may be calculated by beginning with costs incurred during a 12-month period known as a "test year," which may be either an historical or a future period. 83 Ill. Admin. Code § 287.20 (2025). If an historical test year is used, it can be any consecutive 12-month period, beginning no more than 24 months before the utility's filing new tariffs, for which actual data are available at the time of filing. *Id.* "The supreme court has explained that the purpose of the test year rules is 'to prevent a utility from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year.' "

and reasonable. Between the end of 2018 and the end of 2022, Peoples Gas retired and replaced 237 miles (or 59 miles per year) of pipeline, at which rate it will take 26 years (*i.e.*, until 2049) to replace the existing high-risk pipe. It noted that Peoples Gas "makes no attempt in this record to explain the steps [it] will take to complete retirement within or close to the Kiefner Study's specified timeline." Rather, it had stated that accelerating the SMP to such timeline would present practical challenges and provided no disaggregated information that the Commission could use to make an informed decision regarding ways to practically meet the recommended retirement timeframe. The Commission also found that Peoples Gas did not provide SMP spending information to date or explain how the company developed the $265 million 2024 test year amount. It did, however, provide spending data, which showed that, between 2018 and 2022, it spent an average of $265 million per year. This amount appeared to be the amount the company used for the 2024 test year, though it did not, the Commission noted, explain how this figure was determined or why it was prudent for the SMP going forward. It also noted that the company invoked the Kiefner Study

> "to demonstrate a pressing need for SMP, while declining to timely adhere to the Study's pipe retirement recommendations. Most concerning is that [Peoples Gas] makes no attempt to detail and justify the SMP 2024 test year investment level to accomplish SMP's primary objective according to the record—to replace all CI/DI pipeline."

¶ 14 The Commission found Peoples Gas offered an inadequate record justification for maintaining a $265 million spending level and provided no specific justification for continuing to

---

*Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 395-96 (2010) (quoting *Business & Professional People for the Public Interest*, 146 Ill. 2d at 238).

fund the entire SMP at the requested level. It declined to provide information to disaggregate the SMP's components and to identify the components meeting statutory requirements. It instead provided reports (one of which was eight-years-old) as evidence for test year spending, and the company's quarterly reports to the Commission suggested that non-pipeline retirement activities in the SMP were delaying the high-risk CI/DI pipe retirement. Accordingly, the Commission found that the company had not justified continuation of prior-level spending for the SMP and disallowed $265 million from the 2024 test year. It paused the SMP until it could determine, in a separate proceeding, the optimal method to replace high-risk CI/DI pipe and the prudent investment level needed to support the effort. The Commission noted that it expected Peoples Gas to continue to address existing and new leaks as it would normally do to prioritize customer safety (and as confirmed by the company during oral argument). It also noted that the 2024 SMP test year disallowance was not intended to remove any funding related to emergency response to leaks, pipe breaks, or other critical safety measures.

¶ 15    Finally, the Commission ordered a new investigation of the SMP and paused the SMP until the end of the investigation. It noted that it appeared that neighborhood-by-neighborhood modernization had failed to adequately prioritize replacement of high-risk pipe, as directed by a federal agency, the study, and the Commission. The company's regular quarterly reports to the Commission suggested that neighborhood risk ranking was not resulting in prioritizing neighborhoods with the highest levels of risk. It noted that neighborhoods ranked 20 and 21 were scheduled *ahead* of those ranked 1, 2, 3, 5, 7, 10, and 11.

¶ 16                                    2. Rehearing

¶ 17    On December 1, 2023, Peoples Gas filed a verified emergency motion for clarification of the Commission's order, requesting clarification on the scope of the Commission's ordered pause

of the SMP in 2024. The Commission granted, in part, the company's motion, noting that rehearing would focus on SMP work in progress and emergency work, specifically addressing "the extent to which works in progress must be permitted to continue in 2024" and "whether and to what extent emergency work is part of SMP."

¶ 18    On rehearing, in an order entered on May 30, 2024, the Commission authorized $28.5 million for emergency repairs, but again disallowed the remainder (*i.e.*, $114 million) of the company's revised $144.9 million budget. It determined that Peoples Gas had not demonstrated that costs were prudent and found that it appeared that the company was likely to double recover for much of the work.

¶ 19    Specifically, the Commission noted that it had approved a limited scope for rehearing to focus on the SMP works in progress and emergency work, specifically, whether works in progress needed to continue and whether emergency work was part of the paused the SMP. It noted that Peoples Gas had presented during rehearing a *new* category of projects—consisting of emergency work, system improvement (SI) work, and public improvement (PI) work—collectively called emergency, safety, and reliability (ESR). The Commission further noted that it omitted PI and SI work from the scope of rehearing (SI and PI represented "general utility reliability and improvement efforts and responsibilities the company had to third parties and the city"), and that issues related to 2024 SI and PI should be addressed in the pending SMP investigation and in a future rate proceeding. It found that Peoples Gas did not provide a clear definition of emergency work and failed to show that SI and PI represented true emergency work. Thus, it declined to include SI and PI within the rehearing.

¶ 20                              (a) Works in Progress

¶ 21 Next, addressing SMP works in progress, the Commission addressed whether Peoples Gas had established that specific projects on rehearing were within the scope of the proceeding, that the costs were reasonable and prudent, and that the company should be allowed to include the additional cost in its 2024 rate base. It acknowledged that no party contested that works in progress necessary to avoid unintended safety or reliability impacts and service interruptions during the SMP pause should be completed. The Commission noted that Peoples Gas explained that works in progress included several different SMP project categories: neighborhood, PI, SI, and high-pressure. It also explained that 85 projects were in progress as of the SMP pause date and 6 additional projects began after the Commission's final order and it provided data for each work-in-progress project. However, the Commission found, the data was not sufficient for it to conduct a full prudence assessment (such as critical information on risk-ranking bases for project inclusion, reasons for disparities between retired and installed mains, and showings respecting the reasonableness of claimed costs) and that Peoples Gas's position was compromised by its "expansive definition of [works in progress] during oral argument."

¶ 22 The Commission rejected the company's works-in-progress request on several grounds and denied its request to increase its 2024 test year rate base by $82.2 million. It found that Peoples Gas failed to provide sufficient evidence and analysis showing that the SMP works-in-progress projects were prudent and reasonable planning and investment decisions, either initially or as continued work in 2024. For example, the company provided documents containing only general information about its internal decision making steps and templates of its risk-ranking matrices. The company also failed to provide results of its analyses as to specific proposed projects after utilizing its standard procedures and template matrices. The Commission noted that this was particularly concerning. It further noted that, given that several neighborhoods on the works-in-

progress list were not given a high priority risk ranking before being initiated, more specific evidence was needed to justify special treatment for SMP projects in such areas (and providing an example of several neighborhoods that were risk-ranked between 20 and 29 prior to being initiated). Next, it noted that six projects were begun *after* the Commission's final order, and it found that they could not be approved as works in progress in the limited rehearing.

¶ 23    As to the remaining 85 works-in-progress projects, the Commission found that Peoples Gas failed to adequately explain and support its request, due to inadequate and contradictory record-keeping and the provided project-accounting information. Addressing double recovery, the Commission rejected Peoples Gas's claim that it never had an opportunity to respond to the Attorney General's claim that there was no evidence that proposed works-in-progress costs were recovered through QIP. The company's rebuttal testimony, the Commission noted, admitted that it expected 38 of 43 projects identified by the Attorney General to have been completed in 2023. It noted that Peoples Gas did not respond in its reply brief to the Attorney General's concern about the implications of the testimony on works-in-progress projects expected to be completed in 2023 but delayed. Thus, this left unrebutted the Attorney General's assertion that the company included the costs of the 38 projects as plant-in-service in its 2023 rate case. The Commission noted that, though the arguments were presented for the first time on rehearing, it would consider them. It found that it could not determine the extent to which works-in-progress projects overlapped with Peoples Gas's 2023 QIP projects.

¶ 24    The Commission denied the company's request to increase its rate base to include $82.2 million for works in progress. It found that Peoples Gas did not establish the proposed investment tied to works-in-progress projects had not already been accounted for in the company's 2023 plant-in-service. Thus, it declined to approve a rate base and revenue requirement increase for the

proposed works-in-progress projects. It noted that Peoples Gas *acknowledged* that it could seek cost recovery for the work in a further rate proceeding. Further, the Commission noted that any further consideration for the works-in-progress costs must clearly delineate the requested works-in-progress project costs from QIP costs and provide evidence and analysis sufficient to demonstrate the investments were reasonable and prudently incurred.

¶ 25                                      (b) Emergency Work

¶ 26    Next, addressing emergency work, the Commission noted that it granted rehearing to determine whether necessary emergency work was part of Peoples Gas's paused SMP and, if so, to what extent the company's revenue requirement should be increased to account for this work. The Commission acknowledged that completing ongoing work and providing emergency service would be necessary to avoid unintended safety or reliability impacts and service interruptions during the SMP pause. The Commission agreed with the Attorney General and the city's positions and determined that it had specifically limited rehearing to works in progress and emergency work and found that SI and PI are distinct from emergency work and outside its scope. It further found that SI was out of the rehearing scope and did not need to be included in the company's emergency work budget in the rehearing; it was part of the broader SMP category that was better addressed by the Commission through the ongoing investigation in docket No. 24-0081. Next, addressing PI projects, the Commission determined that many were required by the City of Chicago during other street projects, and it acknowledged that the company may need to complete some work required by the city. However, it found that PIs, by definition, are not emergency projects and are outside the scope of rehearing. It declined to include PI projects in the rate base on rehearing.

¶ 27    The Commission further determined that Peoples Gas's justification for cost recovery of $28.9 million for emergency work was not persuasive, and it was unconvinced that the company's

ESR definition as a whole constituted true emergency work. It credited city witness deputy commissioner Kalayil, who identified significant issues with the company's categorization of emergency work, including the timing and scope of several projects. The Commission also noted that it was particularly concerned with Kalayil's assertion that Peoples Gas had been doing extensive non-emergency work in the public way without city agency review and approval and was now characterizing that work to the Commission as emergency work. It noted that the Attorney General's witnesses had analyzed the company's 45 short-cycle list of emergency projects and opined that: 1 project—a Grade 1 leak—represented emergency work; 34 projects "may" represent emergency work; and 10 projects—addressing Grade 3 leaks, resolving third-party coordination concerns, or bolstering system pressure or supply concerns—did not appear to represent emergency work. The Commission found that the Attorney General and the city showed that the company's categorization of emergency projects was overly broad and that the company's evidence did not justify an increase to its revenue requirement for emergency work. It also compared the 45 proposed projects with the company's initial filings in docket No. 24-0206 and found 18 projects on the 2023 QIP project list; it noted it was concerned that emergency work that Peoples Gas had claimed would be conducted in 2024 was actually connected to the 2023 QIP reconciliation. "While the Commission denied the [c]ompany's requested $28.9 million tied to the 45-project list, the Commission also instructs the [c]ompany to ensure 2024 emergency work is not included in its 2023 QIP Reconciliation."

¶ 28    Finally, the Commission noted that it remained concerned about the amount of existing high-risk pipe on Peoples Gas's system and the company's ability to respond to leaks, pipe breaks, or other critical safety measures, including certain Grade 1 leaks. Thus, out of an abundance of caution and to ensure the company has the resources to respond to emergencies to maintain a safe

gas distribution system, it approved an increase to the company's revenue requirement for emergency work. It used the company's three-year historical average of emergency expenditures for purposes of defining an adjustment to the company's rate base, as recommended by the Attorney General. It approved a $28,515,829 increase to the company's rate base to address true emergency conditions, which will result in an additional revenue requirement of $1.6 million.

¶ 29    The Commission also addressed the company's proposed revenue requirement increase of $7.9 million and adopted the lesser revenue requirement increase of $1.6 million. It found this figure will provide the company the opportunity to recover its prudent and reasonable costs of service for projects within the scope of rehearing and allow it to continue providing safe and reliable natural gas service. "This Order does not modify the [c]ompany's options for lawful recovery of adequately supported costs in later proceedings."

¶ 30                B. Investment in Shops & Related Facilities (Peoples Gas)

¶ 31    The next issue concerns the Commission's disallowance of $236.2 million for new shops and facilities. Peoples Gas has operations and maintenance shops in Chicago, and the parties agreed that the shops are old and that the company needed to address the facilities. The Attorney General and the public interest organizations disagreed with Peoples Gas's decision to replace five of its legacy shops with new ones. They asserted that the company had not analyzed less expensive alternatives, such as refurbishment or remodeling that were identified in its reports, or performed a cost-benefit analysis. Thus, they reasoned, because Peoples Gas had not performed these analyses, it did not show the investment was prudent.

¶ 32    Peoples Gas argued that it made a prudent decision to replace aging, inefficient, environmentally contaminated, and, in some cases, dangerous service facilities in Chicago. The company has three principal service shops from which it has conducted operations, maintenance,

and construction activities in the city over the past century, all of which have been replaced in recent years or will need to be by 2025. The company explained that it needed three shops due to safety concerns and to respond to natural gas leaks within 60 minutes of receiving a leak report in the geographically-expansive city. Its newest shop was constructed in 1937, and its oldest shop dates to 1906. Overcrowding conditions in the shops created inefficient and sometimes hazardous conditions for employees. The company retained Mortenson Construction in 2015 to assess the facilities. For each facility, Mortenson considered factors such as the condition of outside areas, building envelopes, roofs, interior conditions, environmental hazards, energy use, mechanical systems, and compliance with building codes. It also considered adaptability of each facility, *i.e.*, whether it could be remodeled or refinished to serve the company's needs, and it gave each facility a score (1 for limited opportunity for re-use to 4 for open flexible space). The north and south shops each received a score of 1 on this metric, and the central and Division Street shops each received a score of 2 (meaning they would require more work to re-use greater than 50% of value). Mortenson recommended replacing the north, central, and south shops, plus the Division Street complex.

¶ 33    In 2016, Peoples Gas hired Cushman Wakefield, a national real estate brokerage, firm to further assess the facilities. Each facility was analyzed for its ability to meet certain goals. Cushman Wakefield made a series of tier-one and tier-two recommendations for construction of new facilities and repurposing and renovating existing facilities. Finally, in 2017, Peoples Gas retained McKissack & McKissack (a national architecture, engineering, and construction management firm) and FH Paschen (a commercial construction and contracting company) to review Cushman Wakefield's recommendations, design new operations facilities, and create

budgets and construction timelines for the projects. Peoples Gas used its own analysis and the McKissack recommendations to plan for construction of new facilities in 2018.

¶ 34 Mortenson created a master plan and made specific findings as to the north shop, central shop, and south shop, recommending that each be replaced. It also found the Division Street complex to be in poor condition (score of 2.2) and recommended that it be replaced. The Cushman Wakefield study developed a portfolio strategy focusing on the four facilities and contained scorecards, recommending the actions that Peoples Gas either took or was taking at the time of the proceedings before the Commission. (The Division Street shop was not replaced; its functions were moved to other facilities.)

¶ 35 Peoples Gas argued that it employed appropriate cost controls when building the facilities, conducted a competitive bidding process to select the design/build contractor, hired a facility program manager, reviewed and approved all sub-contractor bid awards during the design and construction phases, obtained certain preferred pricing, and employed an internal team of project managers and a cost analyst to scrutinize change orders.

¶ 36 Peoples Gas maintained before the Commission that it considered refurbishment and chose that option where possible for a number of facilities (following Mortenson's recommendation), and, thus, the north, central, and south shops were in the minority of all the facilities Mortenson addressed (and where it recommended replacement). It also asserted that it was not feasible to repair or refurbish the older facilities (that it ultimately decided to replace) to improve safety and better serve customers (noting employee complaints about the facilities). The company argued that the Attorney General and the public interest organizations had engaged in hindsight review in alleging that Peoples Gas did not consider alternatives. It maintained that its actions were reasonable and prudent under the circumstances that existed at the time. Finally, addressing

arguments about the relative cost of alternatives, Peoples Gas responded that the cost of the new facilities was "justified given the state of the facilities and the near-impossible task of renovating them to the necessary standard[.]" Cost was important, it conceded, but other factors should not be disregarded, such as customer service, operating efficiency, employee safety, ADA compliance, reducing environmental impacts, and so on.

¶ 37    The Attorney General took the position that the record did not support Peoples Gas's position that the newly-constructed facilities were necessary or that significantly less costly alternatives were unavailable. He asked the Commission to disallow the company's request to recover about $236.2 million for five facilities and the renovation of one existing facility because the company failed to show that: the old facilities were unable to support the provision of service to the company's customers; the new facilities are appropriate in size and scope; sufficient alternatives analyses were performed on options other than "do nothing" and "repairs"; and the magnitude of the investments represented a reasonable use of ratepayer funds. The Attorney General argued that the facilities reports Peoples Gas cited provided only conclusory statements, no meaningful analysis, and showed that the company's negligent maintenance practices likely contributed to the facilities' dilapidated condition.

¶ 38    In response to the company's argument that it conducted an alternatives analysis, the Attorney General argued that the alternatives analysis was fatally deficient because it provided no evaluation or examples showing that existing facilities rendered it unable to serve customers at a modern level or what a modern level meant. As for upgrades/improvements, the Attorney General took the position that the company provided no cost estimates for such or analysis showing how or why such repairs would be very costly. He also pointed to the Mortenson report's cost estimate, which showed that the cost to repair the north shop was $3.9 million, versus the $24.7 to $28.4

million cost to build a new facility, reflecting that the company's decisions were unjustified. He also noted that the Mortenson report lacked any comparative analysis. Notwithstanding the report, he asserted that the company's alternatives analysis provided no basic information and no cost-benefit analysis, which were necessary to evaluate Peoples Gas's decision.

¶ 39 The Attorney General also disputed that the Cushman Wakefield report contained renovation scenarios; instead, he asserted, it contained conclusory assertions. It also did not contain any cost-benefit analysis of alternatives, nor evidence supporting dismissal of the repair option or that the costs to purchase and renovate an existing building were even considered. The Attorney General argued that the Cushman Wakefield report agreed with his position that new facilities would result in *higher* costs over a 20-year timeframe, even when higher operations and maintenance costs for the existing facilities are accounted for. (This was also true, he asserted, when the figures from the report were calculated in present dollars.) The Attorney General raised similar arguments concerning the McKissack and Paschen reports, asserting they also did not evaluate alternatives, cost reasonableness, operational necessity, or provide any further meaningful perspective. He also noted his witness's, Rod Walker's (a natural gas engineer's), testimony that the Mortenson report primarily focused on assessing existing facility conditions and stated that a lack of ongoing capital investment in maintenance programs resulted in compounding issues, including unchecked roof leaks that damaged drywall, paint, and ceilings. The Attorney General argued that the company's report showed that its deficient maintenance practices contributed to deteriorating, dilapidated infrastructure of the facilities, and it was not reasonable or prudent for ratepayers to pay the full cost of the company's poorly maintained properties.

¶ 40 The Attorney General acknowledged that the Mortenson report proposed replacing several facilities, but noted that it also showed that issues related to the facilities could have been addressed

at far lower cost. He argued that Peoples Gas ignored or never properly considered the potential savings in its approach. He further asserted that the company was afforded multiple opportunities to provide its alternatives analysis and cost-benefit analysis to demonstrate that its decision to build new construction or remodel each facility was the most cost-effective approach but declined to do so.

¶ 41    The public interest organizations argued that, in response to their discovery request, Peoples Gas admitted that the Cushman Wakefield report did not compare the net costs associated with construction of new operational facilities with the net costs of refurbishment, repair, remodeling, or refinishing of the legacy shops. It failed to provide any analysis comparing the cost of repairing the facilities with the costs of replacement (or, alternatively, the net benefits to ratepayers of each option). Nor did it conduct the analysis it should have conducted to ensure its investments were in its customers' best interests.

¶ 42    Catherine Elder, a witness for the public interest organizations, testified that Peoples Gas's reports did not demonstrate the new operational facilities were in customers' best interests. The studies, she opined, did not rigorously compare cost to ratepayers of constructing new facilities versus the cost to them of refurbishing or renovating existing facilities or any other alternative. She performed her own operations and maintenance analysis and opined that there would be no operations and maintenance savings associated with the new facilities. She recommended that the Commission disallow the costs of Peoples Gas's new facilities.

¶ 43    Peoples Gas's witnesses, Polly Eldringhoff (WEC's vice president of operational performance and compliance) and Alan Weber (Peoples Gas's area manager) testified about the Mortensen, Cushman Wakefield, and McKissack reports. Eldringhoff testified that the new shops would provide operational benefits, efficiency, pedestrian and employee safety, and reduce

operations and maintenance expenses. Weber addressed the 2015 Mortenson report and opined that the facilities should be replaced. The Attorney General presented testimony from Walker, who testified that the company considered the same two alternative approaches for each of the facilities—do nothing or perform upgrades/improvements—but the company did not provide any analysis for these alternatives or provide cost estimates for repairs/upgrades. He also criticized Peoples Gas for not considering purchasing existing facilities and modifying them for its needs, or considering targeted repairs/upgrades, such as parking solutions, facility expansions, etc. He criticized the company's reliance on reports from 2015, 2016, and 2017, characterizing them as obsolete and/or irrelevant and opining that they did not justify full replacement of the facilities or their costs. Nor did he believe that the facilities were necessary, especially at the cost proposed. Walker disputed Peoples Gas's claim about operations and maintenance savings and opined that its analysis showed no material operations and maintenance savings and a total of tens of millions of dollars in additional incremental revenue requirement. He concluded that the company failed to justify $236.2 million on new facilities as prudent and recommended that the Commission disallow recovery.

¶ 44    The Commission disallowed $236.2 million for the facilities. It noted that the evidence showed that the subject buildings were in poor condition, but that there was insufficient evidence showing that the newly-constructed facilities were prudent. Peoples Gas, it determined, did not meet its burden to support its request to recover the costs through the rate base. The reports the company submitted identified issues with existing buildings and provided recommendations on how to address them. The Commission found the reports provided solutions and strategies to ameliorate problems with existing buildings; however, Peoples Gas failed to demonstrate that the costs it incurred were prudent, after considering alternatives. The company did not supply cost-

benefit analyses for each facility or an alternatives analysis evaluating costs and other considerations of repair, repurpose, and replace options. Further, the Mortenson report identified repairs and upgrades for each shop that could have been pursued to maintain their operations. The Commission noted that the report showed that the estimated cost to upgrade and repair the north shop was $3.95 million, versus the $69.3 million that Peoples Gas wished to add to the rate base. It also found that it was unclear if the company even considered this or other alternatives when developing a strategy to modernize its facilities.

¶ 45    The Commission also determined that Peoples Gas failed to show why it could not have pursued the investments identified in the Mortenson report to continue operating existing shops, delay the need to build new shops, or pursue some combination of the two. "The Commission acknowledges that a least-cost standard is not applicable to these facilities. However, [Peoples Gas] must consider the cost to ratepayers when it embarks on capital investment, especially when [its] own report identifies cheaper alternatives." It noted that, in response to a question asking how the company balanced the need for its new shops with its other capital investments, Peoples Gas did *not* directly answer the question and instead responded "with its process for internal project approval and provided no explanation of its consideration of the costs of these projects in the context of [its] total portfolio."

¶ 46    The Commission noted that "analyses of alternatives to new, upgraded replacement facilities, cost-benefit projections for the investments, and rate impact assessments—with supporting documentation—are reasonable steps that a utility should take before initiating a capital investment project of this magnitude." Peoples Gas, it noted, did not address the apparent lack of planning that led to its decision to rebuild all the facilities at nearly the same time. Accordingly, the Commission disallowed $236.2 million for the facilities.

¶ 47                    C. Clavey Road Project Costs (North Shore)

¶ 48    North Shore's Clavey Road Phase II Public Improvement Project addressed a conflict with the City of Highland Park's storm sewer upsizing, reconfiguration, and road replacement project. North Shore sought to recover the $4.1 million final cost of its Clavey Road project. The company installed 2,450 feet of 12-inch steel high pressure main, 1,115 feet of 2-inch medium pressure main, and retired older main that conflicted with the city's storm sewer. The location was a suburban residential street. The company maintained that, after construction began, it recognized that Highland Park's design plans, which it relied upon to design its facilities, were changing and contained errors. North Shore had to bury its pipe deeper than originally planned to avoid the city's facilities. This could not have been anticipated, according to the company. It noted that it estimated the cost of the Clavey Road project by categorizing each cost component, including management and design, construction, installation, materials, environmental, labor, and restoration. It also analyzed historical unit pricing and deployed a competitive bidding process. The original cost estimate for the project was $2.28 million, and North Shore also used its $592,000 contingency and incurred about $1.2 million in overages, which the company claimed were due to revised sewer designs and the leaking of a temporary storm sewer. The total cost of the project was $4.1 million due to the overruns.

¶ 49    The Attorney General asked the Commission to disallow $1.689 million from North Shore's proposed costs for the Clavey Road project (reflecting the difference between what North Shore spent and an industry-wide benchmark cost for a comparable project, adjusted for pipe size, regional cost variation, and inflation, as calculated by Walker). The Attorney General argued that North Shore had failed to provide a timeline for the project, project design, permit review milestone dates, and descriptions or dates of the alleged changes or errors that might justify why

it did not discover changes and errors until so late in the project. This showed, he asserted, a lack of due diligence and poor management, as well as a blind eye toward regulatory accountability. Next, addressing North Shore's contention that a water main being found to be closer to the new gas main than shown on plans was unforeseeable, the Attorney General argued that North Shore's failure to utilize effective engineering methods to determine sub-surface facilities and have accurate records of the site was not unforeseeable. Finally, the Attorney General argued that North Shore offered no justification as to why a temporary storm sewer's failure was unforeseeable, where the company failed to state who installed the temporary sewer, why it was installed, who was responsible to maintain it while in operation, whether its failure was the result of poor craftsmanship or damage sustained during excavation, or whether some other factor caused it to leak into North Shore's tie-in area.

¶ 50    Attorney General witness Walker ran a benchmark analysis and recommended a $1.68 million disallowance. He testified that the project cost of $5.6/mile was excessively high, as were the company's claimed incremental costs for additional depth. North Shore's costs would have been high even for an urban project; this project is located on the outskirts of the city on a residential street. Walker noted that, regardless of the benchmark, North Shore exceeded its budget by 68%, exhausted its contingency, and incurred nearly $1 million in overages. He testified that, given that: (1) the only discrete cost-impact information North Shore provided related to the changes concerning the change in depth; and (2) it did not identify any other costs justifying a higher-than-typical cost or show that this project was extraordinary in any way, the Commission should disallow $1.68 million. Walker also testified that his calculated benchmark was an average of real-world projects that each would have had their challenges and unique costs associated with them, similar to the depth issue with the Clavey Road project.

¶ 51　　Company witness Eldringhoff testified that the additional costs could not have been anticipated. She disagreed with Walker's use of a benchmark to recalculate the costs of the project, testifying that there are inherent inaccuracies in using it. Actual costs were known here, as were actual field conditions.

¶ 52　　The Commission disallowed $1.689 million. It agreed with the Attorney General that the use of a benchmark was a standard testing method for reviewing project costs for reasonableness and was a valuable check on both budgeted and incurred costs. Walker stated that his benchmark accounted for variables raised by North Shore. The Attorney General, the Commission further found, demonstrated a 68% cost variance between the budgeted and actual costs incurred for the project, or $1.54 million. This was "commensurate" with Walker's benchmark disallowance of $1.689 million.

¶ 53　　The Commission further determined that North Shore did not provide sufficient evidence demonstrating that the additional costs identified by the Attorney General were unforeseeable or prudently incurred. Walker's benchmark analysis supported the Attorney General's contention that the identified costs were excessive. North Shore, the Commission found, did not provide the timeline of the project, project design, permit review milestone dates, or descriptions or dates of the alleged changes or errors to justify its assertion that the additional costs were unavoidable, unforeseen, and out of the company's control. As an example of the company's lack of prudence, the Commission noted that it failed to provide basic information about the temporary storm sewer's failure, such as who installed it, why, and what caused the failure.

¶ 54　　　　　　　　　　C. Rate Case Expense (North Shore)

¶ 55　　North Shore filed a rate case expense (*i.e.*, attorney and expert fees) estimate of $3.5 million (resulting in $1.7 million in test year expenses). 220 ILCS 5/9-229 (West 2022) (allowing utilities

to recover the just and reasonable amounts expended for "attorneys and technical experts to prepare and litigate a general rate case").[7] The company argued that its attorneys' and experts' rates were in market and that their time was reasonable. The Attorney General proposed a disallowance of $1.4 million.

¶ 56    North Shore's witnesses, Koby Bailey and Joseph Zgonc, testified on its behalf. Bailey, WEC's senior counsel for regulatory affairs, opined that the company's rate case expense was reasonable and that its submission complied with the Commission's requirements. Zgonc, WEC's manager for financial and regulatory planning, addressed the company's expense documentation. The documents were heavily redacted and removed the descriptions of the work performed, the number of hours worked, and/or the hourly rate for various experts and attorneys. However, North Shore subsequently removed some of the redactions.

¶ 57    The Attorney General's expert, Mary Selvaggio, a certified public accountant and former Commission accounting employee (for 33 years), testified that the rate case expense was neither just, nor reasonable. She testified that the company's rate case expense had a significant impact on ratepayers—$10.74 per customer, which was multiple times higher than that of any other utility. It also exceeded the expenses of each of the four major utilities that filed tariffs in 2023, and the Companies, combined, had fewer customers than any other utility (excluding one). Selvaggio also testified that the Companies were the only utilities to utilize multiple law firms for their rate cases and that both utilities' legal fees exceeded 50% of the overall rate case expense, which was higher than all but one other utility. The Companies also paid their expert witnesses significantly more

---

[7]Peoples Gas made a similar filing but does not appeal from the Commission's disallowance as to its filing.

than other natural gas utilities paid their consultants. They also paid over $2 million to their parent company, as compared to zero for Nicor Gas and $406,000 for Ameren Illinois' gas rate case. Selvaggio further testified that North Shore's $3.5 million rate case expense comprised 18.7% of its entire requested rate increase, which she stated was exceptionally high. The next highest utility's expense to rate increase ratio was 4% (Peoples Gas) and all other utilities were under 2%, with ComEd's ratio being the smallest (0.3%). On a per-customer basis, North Shore's rate case expense was the highest at $10.74 per customer per year, followed by Peoples Gas ($2.94) and Ameren ($2.09; gas), with ComEd being the lowest ($0.37). Selvaggio recommended a reasonableness adjustment of $1.4 million, which she calculated using Ameren's average annual per-customer charge of $2.09 (which was the highest, following the Companies). She also testified that the Companies appeared to be duplicating efforts. Selvaggio noted that they are owned by the same parent company, their cases were consolidated, and many issues (rate of return on rate base, rate design, and a low income rate, rider proposals, and cash-working capital) were the same. "The costs for essentially identical work are paid for twice." The companies were also the only two entities that included costs for two different law firms in rate case expense. She also explained that the supporting documentation noted costs for tasks that "may be attributable to cases other than this proceeding," "represented the coordination of filings of other gas utilities to achieve an unknown goal," and "were for activities that may duplicate the tasks of other internal and external attorneys" and company representatives.

¶ 58    The Commission adopted Selvaggio's recommendation and disallowed $1.4 million.

¶ 59            D. Long-Term Gas Infrastructure Plans (the Companies)

¶ 60    The final issue concerns the Commission's order that the Companies file biannual long-term gas infrastructure plans (LTGIPs) beginning July 1, 2025. The Companies took the position

that the proposals of several intervenors sought to turn this rate case into a broader investigation of policy proposals and initiatives related to decarbonization and the "future of gas." The Companies asserted that these proposals had little or nothing to do with the test year rates and, instead, sought to change the natural gas industry and were based on speculative and uncertain predictions about the pace and feasibility of decarbonization and electrification efforts in Illinois. As a result, they were premature. Further, they would make it more costly and difficult for the Companies, for example, to modernize Chicago's gas infrastructure and to improve its reliability and safety.

¶ 61    Addressing integrated resource planning, the Companies asserted that there was no statutory basis requiring this for a gas utility, and there were practical problems with such a proposal, like increased costs and project delays (as testified to by Eldringhoff). The Companies presented witness Theodore Eidukas, who objected to the LTGIP based on his legal opinion that the Commission lacked authority to require such a report. Brad Cebulko, a witness for the public interest organizations, recommended that the Commission require the Companies to file LTGIPs to assess their resource and major capital investment needs.

¶ 62    The Commission acknowledged that the parties disagreed on the appropriate proceeding in which to address many of the Attorney General's and the public interest organizations' proposals and noted that its order did not reflect a determination that certain proposals were or were not appropriate to consider as part of a rate case.

¶ 63    Addressing the LTGIPs, the Commission noted that it agreed with the public interest organizations that the Companies likely engaged in internal system planning, but further noted that they did not submit a public long-term system plan and that this created an inherent information asymmetry between the Companies and the Commission. The Companies' lack of transparent

planning, it found, made it challenging for the Commission, customers, and other stakeholders to determine whether the Companies were prioritizing just, reasonable, and prudent investments that are likely to be used and useful. Accordingly, the Commission found that the Companies' capital spending and associated planning, budgeting, and project selection processes merited careful consideration "in this and future rate cases."

¶ 64    Citing to sections 4-101, 8-501, 9-201(c), and 9-211 of the Act (220 ILCS 5/4-101, 8-501, 9-201(c), 9-211 (West 2022)), the Commission noted that it had authority to do what was reasonably necessary to effectuate the legislature's objectives. It ordered the Companies to file LTGIPs with the Commission every two years, beginning on July 1, 2025, in order to "remedy the difficulty of obtaining information in this case and to aid in the Commission's informed review of the Companies' future rate increase requests." It noted that, at a minimum, the LTGIPs include: (1) a list of proposed system expenditures and investments, including analysis of infrastructure needs and detailed information on all planned projects within the action plan; (2) a demonstration that each project or program plan complies with Commission rules and jurisdiction requirements; (3) a five-year action plan of investments with a longer-term planning horizon analysis where applicable; (4) the estimated total cost and annual incremental revenue requirement of the proposed action plan; (5) an explanation for the pace of each project or program, including why it cannot be deferred to future years; (6) comparative evaluations of resource procurements and major capital investments; (7) distribution mapping that identifies areas of constraint and risk, location of planned projects, pressure districts served by each project, and locations of environmental justice communities; (8) a description of lowest-societal-cost gas distribution system investments necessary to meet customer demand and comply with public policy objectives; (9) a demonstration that the program or project will minimize rate impacts on customers, particularly low-income and

equity-investment-eligible communities; (10) a scenario and sensitivity analysis to test the robustness of the utilities' portfolio and investments under various parameters; (11) publicly filed workpaper documenting all inputs and assumptions with limited use of confidentiality; and (12) a summary of stakeholder participation and input, and an explanation of how the company incorporated stakeholder engagement.

¶ 65    The Companies appeal.

¶ 66                                II. ANALYSIS

¶ 67    Peoples Gas challenges: (1) the Commission's decision on rehearing that disallowed certain amounts in its SMP budget; and (2) its disallowance of funds for new shops and facilities. North Shore challenges the Commission's disallowance of certain amounts for its: (1) Clavey Road project; and (2) rate case expense. Finally, the Companies appeal the Commission's directive to file LTGIPs.

¶ 68    The Act creates the Commission, which is the administrative agency responsible for setting rates that public utilities may charge their customers. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 6; 220 ILCS 5/2-101 (West 2022). The statute provides that all rates and charges by public utilities, as well as all rules and regulations concerning those charges, must be "just and reasonable." 220 ILCS 5/9-101, 9-201 (West 2022). In ratemaking-related proceedings, "the burden of proof to establish the justness and reasonableness of the proposed rates or other charges *** shall be upon the utility." *Id.* § 9-201(c).

¶ 69    The supreme court

            "has long recognized that the Commission 'is not a judicial body, and its orders are
            not *res judicata* in later proceedings before it.' *Mississippi River Fuel Corp. v. Illinois
            Commerce Comm'n*, 1 Ill. 2d 509, 513 (1953). The Commission, as a regulatory body, has

the 'power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding.' [*Id.*]; see also *Citizens Utility Board*, 166 Ill. 2d at 125 (holding the Commission's past precedent of allowing full recovery of statutorily imposed operating expenses 'is not controlling, because the Commission is a legislative and not a judicial body, and generally its decisions are not *res judicata* in later proceedings before it'); *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 22-23 (1994) (rejecting argument that the Commission is bound by its prior orders under the doctrine of *res judicata*)." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 24.

¶ 70     The Commission "must allow the utility to recover costs prudently and reasonably incurred." *Citizens Utility Board*, 166 Ill. 2d at 121 (citing 220 ILCS 5/1-102(a)(iv) (West 1992)). " 'Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made.' " *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 428 (2003) (quoting *Illinois Power Co. v. Illinois Commerce Comm'n*, 245 Ill. App. 3d 367, 371 (1993)). "[T]he prudence standard recognizes that reasonable persons can have honest differences of opinion without one or the other necessarily being 'imprudent.' " *Id.* at 435. "[T]he Commission should disallow recovery of any cost of capital in excess of that reasonably necessary for the provision of services." *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 746 (1995). In examining the prudence and reasonableness of actions, hindsight review is prohibited. *Illinois Power Co.*, 339 Ill. App. 3d at 428.

¶ 71     Judicial review of final orders issued by the Commission "involves the exercise of special statutory jurisdiction and is constrained by the provisions of the [Act]." *Commonwealth Edison*

*Co. v. Illinois Commerce Comm'n*, 2019 IL App (2d) 180504, ¶ 51. Section 10-201(d) of the Act states that the "rules, regulations, orders or decisions of the Commission shall be held to be *prima facie* reasonable" and that the burden of proof upon all issues raised by an appeal from an order issued by the Commission is upon the party appealing from that order. 220 ILCS 5/10-201(d) (West 2022). A reviewing court is required to give substantial deference to the orders of the Commission because of the Commission's expertise and experience in the area of setting rates. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009).

¶ 72 Judicial review of a decision by the Commission is limited to four questions: "(1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated." *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476 (1994). "Substantial evidence" is simply "evidence that a reasonable mind might accept as adequate to support a conclusion." (Internal quotation marks omitted.) *Welch v. Hoeh*, 314 Ill. App. 3d 1027, 1035 (2000). It is not conclusive evidence, and it requires more than a mere scintilla but less than a preponderance of evidence. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514. "Substantial evidence can support multiple possible findings." *Citizens Utility Board v. Illinois Commerce Comm'n*, 2018 IL App (1st) 170527, ¶ 36. The Commission's findings are deemed to be *prima facie* true and correct, and the party challenging them has the burden of showing them to be against the manifest weight of the evidence. 220 ILCS 5/10-201(d) (West 2022); see *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) ("In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or

substitute its judgment for that of the agency. Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence.").

¶ 73    Questions of law, such as the interpretation of statute or a regulation of the Commission, are reviewed *de novo*. *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 42. "While we are not bound by the Commission's conclusion on questions of law, we will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." (Internal quotation marks omitted.) *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 6. The reason for this deference is that "courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise[,] and *** agencies must have wide latitude to adopt regulations reasonably necessary to effectuate their statutory functions." (Internal quotation marks omitted.) *Id.* Deference to the Commission is especially appropriate in matters of ratemaking because such matters are legislative in character and the legislature has entrusted the Commission, not the courts, to use its sound judgment and expertise in determining rates. *Madigan*, 2015 IL 116005, ¶ 23; *Cerro Copper Products v. Illinois Commerce Comm'n*, 83 Ill. 2d 364, 371 (1980); *City of Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 622 (1996). Judges are not utility regulators. *Madigan*, 2015 IL 116005, ¶ 22. However, where the Commission departs from its usual rules of decision to reach an unexplained result in a single case, thus, depriving a party of equal treatment before it, its decision is entitled to less deference. *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 715 (1997).

¶ 74                    A. SMP Disallowance (Peoples Gas)

¶ 75    Peoples Gas argues that the Commission's SMP disallowance was erroneous, where (1) the Commission directed Peoples Gas to perform unfunded work; and (2) the Commission's new

cost deferral approach disregards test year principles and constitutes further error. Peoples Gas asserts that the Commission's initial $265 million disallowance, paired with its subsequent directive that Peoples Gas continue non-neighborhood SMP work, was unlawful, where the Commission cannot lawfully instruct the company to do necessary SMP work in Chicago (*i.e.*, non-neighborhood work), while simultaneously denying all funding for that work. It requests that this court restore $116 million required to comply with the Commission's directive, because it is entitled by law to cost recovery for that work, where the $116 million is for the same SMP work that was included within its initially requested $265 million and does not constitute funding for new SMP work, as respondents imply.

¶ 76　Peoples Gas further argues that the Commission's "unfunded mandate" violates the most basic principle of ratemaking: utilities are entitled to recover the reasonable and prudent cost of providing service to customers. Here, it asserts, the Commission approved a marginal revenue requirement that funded a mere fraction of Peoples Gas's 2024 SMP work, thereby turning the traditional utility cost-of-service model on its head. It did so, Peoples Gas further asserts, while repeatedly warning the company that it must still comply with the statute's safety and reliability provisions. The practical effect, Peoples Gas argues, is that it must continue doing whatever it deems necessary to preserve safety and reliability at its own expense, "or else." The Commission ordered the company to continue $116 million of SMP work in 2024, finding it necessary for system safety and reliability, while denying cost recovery for the very same SMP work, finding it imprudent and unreasonable. These conflicting positions, Peoples Gas argues, cannot be reconciled, and the order is arbitrary and unlawful.

¶ 77　The Attorney General responds first that Peoples Gas does not challenge the portion of the final order disallowing the company's SMP spending as imprudent and, so, it forfeited any

challenge to the propriety of that ruling. He notes that Peoples Gas instead argues more narrowly that the Commission's rehearing order, which added $28.5 million to Peoples Gas's rate base instead of its requested $144.9 million, forced Peoples Gas to do $116.4 million (*i.e.*, the difference) of work "for free." This "free" work, the Attorney General further notes, is the "emergency" work the Commission explained it expected the company to continue completing per its statutory mandate. Thus, in the Attorney General's view, the issue on appeal is whether the Commission factually erred in finding on rehearing that the $116 million it declined to add to Peoples Gas's rate base arose from projects that were imprudent or exceeded the rehearing's scope. He argues that the findings were supported by substantial evidence and that this court should affirm the Commission's rehearing order.

¶ 78    The Attorney General further argues that substantial evidence supported the Commission's findings, where Peoples Gas failed to show that its proposed work-in-progress projects were: (1) within the scope of rehearing; (2) prudent; and (3) its proposed ESR projects were in fact true "emergency" projects. As to the first argument, the Attorney General argues that the record supported the finding that the company failed to show that its proposed $82.8 million SMP work-in-progress projects were within the scope of rehearing and prudent. His technical experts explained that Peoples Gas provided no data to show how it determined which specific projects it believed were necessary to address imminent safety threats. This was, as the Commission noted, "particularly concerning" because several neighborhoods on the company's list were not given high-priority risk rankings before the projects began. The Attorney General also argues that the company cites no evidence that the Commission overlooked. He also asserts that the record supports the findings of more specific inadequacies in Peoples Gas's evidence. For example, Peoples Gas listed a project that involved replacing 386 feet of pipe with 5,608 feet of pipe with

no explanation for the increase beyond that it was the second phase of a four-phase project. The company also began six of its proposed SMP work-in-progress projects *after* the Commission ordered it to pause the SMP, thereby contradicting the order. The Attorney General notes that the company did not contest that it violated the order but attempted to justify the violation on the ground that compliance would have been impracticable as a business matter. The Commission, he notes, declined to excuse the violation, and a dispute regarding the agency's business judgment cannot support reversal. The Attorney General also argues that the evidence supported the finding that Peoples Gas failed to show prudent SMP management and recordkeeping, specifically, recordkeeping sufficient to show that its requested additions to its rate base for SMP work in progress would not result in double recovery at its customers' expense. The Commission noted that many of the proposed SMP work-in-progress projects for which the company sought recovery on rehearing *overlapped* with projects for which it sought recovery in its 2023 QIP reconciliation case. And the company *confirmed* that 38 of the 43 newly added SMP projects were completed in 2023. Granting cost recovery for those projects, the Attorney General argues, would have resulted in double recovery because the Commission disallowed costs only for a 2024 future test year. Finally, he argues that, to the extent there was a conflict in the evidence regarding whether adding the projects to the rate base would have yielded double recovery, the Commission was entitled to resolve that conflict against Peoples Gas.

¶ 79     Second, the Attorney General contends that Peoples Gas failed to show its right to cost recovery beyond $28.5 million for the ESR work it proposed on rehearing. He asserts that, contrary to the Commission's directive to present only emergency projects for cost recovery on rehearing, the company sought to recover for all its ESR work, into which it improperly tried to shoehorn $33.2 million worth of non-emergency, long-term proactive SI and PI projects. The

Attorney General notes testimony that these projects were simply a mix of unreviewed integrity management and PI projects for which Peoples Gas sought pre-approval and funding to bypass the ordinary rate case prudence-review process. He notes that, in the principal rate case, the Commission had already approved a revenue requirement of over $1 billion, 91% of the amount the company requested despite the SMP pause. The purpose of the limited-scope rehearing, the Attorney General argues, was not to give Peoples Gas a second bite at the apple on the remaining 9%, but, rather, to clarify whether the SMP pause inadvertently excluded cost recovery for "emergency work" that could not safely wait for the end of the SMP pause. The Commission's finding, he argues, was supported by substantial evidence. He also notes that his experts testified that the company provided generalized statements regarding the necessity of pipeline replacements but no evidence addressing the thresholds for selecting projects. The Commission, he argues, was free to base its factual findings on this testimony.

¶ 80    Finally, the Attorney General contends that the company erroneously seizes on one sentence at the end of the rehearing order that it mischaracterizes as a legal error. It notes that, after finding that Peoples Gas failed to support its request to recover costs for the projects it proposed on rehearing, the Commission unremarkably noted that its order would "not modify the Company's options for lawful recovery of adequately supported costs in later proceedings." The Attorney General disputes the company's assertion that the Commission adopted a "new cost deferral approach" that "disregards test year principles." He notes that the test year rule requires a utility bringing a rate case to submit its supporting data in the form of a 12-month historical or future period to prevent it from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year. Regarding depreciation, it forbids letting a utility recover deferred expenses for depreciation that occurred before the test year. Here,

the Attorney General argues, the rehearing order neither permitted Peoples Gas to mismatch low revenue data from one year with high expense data from another year, nor allowed it to recover additional expenses not incurred during the test year. The order simply found that the company failed to show that its proposed work-in-progress projects were within the scope of the rehearing and prudent, and it failed to show that certain ESR projects in fact represented emergency work. The Commission did not defer consideration of the projects to a later date, but fully considered them in this case. Its observation that nothing stops the company from seeking to include the projects in its rate base in a future case did not, the Attorney General urges, mean that its ruling hinged on Peoples Gas later justifying cost recovery for these projects.

¶ 81     In its response brief, the Commission contends that it did not order Peoples Gas to perform unfunded work; it determined that the company failed to show that more than the $28.5 million approved by the Commission was necessary to allow it to fulfill its legal obligations. The Commission further argues that its disallowance of Peoples Gas's work-in-progress projects was not against the manifest weight of the evidence, where (1) the proposed $33.2 million for new SI and PI work was outside the scope of rehearing; and (2) the disallowance of $82.8 million for works in progress was not erroneous, where six of the projects were not works in progress because they began after the Commission directed the company to pause the SMP, the company failed to appropriately risk-rank the SMP projects both initially and on rehearing, and the company never rebutted the Attorney General's argument regarding double recovery. Finally, the Commission addresses Peoples Gas's contention that it used a new cost deferral approach. The Commission asserts that it merely restated the law and its practice and notes that, when it disallows recovery of costs, a utility can try again with supporting evidence in its next rate case if that cost remains

eligible for recovery. This is precisely, it contends, what Peoples Gas's counsel *asked for* during oral argument and what company witnesses Eldringhoff and Margaret Salvatore stated.

¶ 82     In reply, Peoples Gas again contends that the Commission illegally directed it to do $116 million of SMP work without cost recovery. It asserts that none of the Commission's orders state that Peoples Gas is only required to continue true emergency work or work in progress; rather, the directive is much broader: the company must "address existing and new leaks as it would in the normal course of prioritizing customer safety." Peoples Gas argues that it showed it would take $144.9 million to do that, but the Commission only gave it $28.5 million. It maintains that its budget for 2024 SMP, including neighborhood and non-neighborhood work, was $265 million, with about $120 million allotted for the neighborhood program and $144.9 million for non-neighborhood work. The Commission disallowed the entire $265 million, while simultaneously directing Peoples Gas to pause only the neighborhood portion of its SMP in 2024. If that was the case, the disallowance, the company contends, should have been $120 million, leaving $144.9 million for non-neighborhood work. Ultimately, on rehearing, the Commission restored only $28.5 million of the disallowance, while maintaining its order for the company, Peoples Gas argues, to do much more than that: to continue addressing existing and new leaks. Thus, the company contends, it must continue all non-neighborhood SMP work—a majority of which is required by local, state, and federal law, "on its own dime."

¶ 83     Finally, Peoples Gas asserts that the Commission's unfunded mandate violates ratemaking principles, which guarantees full recovery in rates for reasonable and prudent costs, and the prudence standard. Further, it argues that the Commission's proposed cure—to seek recovery in a later test year—also defies those principles, as it prohibits recovery of the company's depreciation expenses. The Commission's directive cannot stand with its $116 million

disallowance for the same work.  Work the Commission orders a utility to do is by definition reasonable and prudent and, thus, recoverable, the company notes.  It argues that telling it to continue to address non-neighborhood SMP work (or face legal penalties), while also disallowing recovery for the same work, is unlawful and unreasonable.  Peoples Gas asserts that recovery in a further rate case, if granted, would still deny it full recovery.

¶ 84    We conclude that the Commission did not err in adding $28.5 million to Peoples Gas's rate base.  The Commission did not err in finding that Peoples Gas failed to show that its proposed SMP spending was prudent and reasonable.  In its final order, it explained how the company was lagging in replacing its CI and DI pipe by 2030.  It also found that the SMP's bundling of replacement and non-replacement work was delaying replacement work, and it found that the neighborhood program inadequately prioritized replacement projects.  Accordingly, it disallowed $265 million of SMP spending in Peoples Gas's rate base, ordered an investigation into the SMP on a separate docket, and ordered a pause of further SMP work pending the outcome of that investigation.  The Commission explained that the disallowance applied only to funding of the SMP's neighborhood program, not funding for emergency responses to pipe leaks and breaks and noted that it expected the company to continue fulfilling its statutory mandate to complete such emergency work as it arises.

¶ 85    Turning to the rehearing, the Commission limited the scope of rehearing to whether the revenue requirement should increase to account for work that "could be necessary to avoid unintended safety or reliability impacts and service interruptions during the SMP pause"; specifically, works in progress that could pose safety concerns if left unfinished and emergency work.  On rehearing, Peoples Gas asked to add $144.9 million to its rate base: (1) $82.8 million for works in progress under its neighborhood program; and (2) $62.1 million for ESR work (a

category first announced during rehearing that included emergency, SI, and PI projects). The Commission reasonably found that the company did not meet its burden to show that the $82.8 million in SMP works in progress were within the scope of rehearing and prudent, and it added $28.5 million of the requested $62.1 million to the company's rate base to account for emergency work.

¶ 86    Addressing works in progress, the Commission found that the company did not show that the projects were prudent and reasonable, where it did not provide results of its analyses of specific projects, several neighborhoods were not given high priority risk ratings prior to the work being initiated, and where six projects commenced after the Commission's final order directing a pause to the SMP. The Commission reasonably determined that the company did not provide data to show how it determined which projects were necessary to address imminent safety concerns and specifically noted that several neighborhoods on its list were not given high-priority risk rankings before the projects began. The Commission also noted a project that involved replacing 386 feet of pipe with 5,608 feet of pipe without explanation for the increase other than it was the second phase of a four-phase project. The Commission was also reasonably concerned with Peoples Gas's commencement of six of its proposed SMP works in progress projects *after* the agency paused the SMP. Further, the Commission did not err in finding that Peoples Gas failed to show prudent SMP management and recordkeeping, especially with respect to establishing that the company's requested additions to its rate base would not result in double recovery (because they overlapped with projects for which the company sought to recover in its 2023 QIP reconciliation case). Indeed, the company conceded that 38 of the 43 newly added SMP work in progress projects were completed in 2023.

¶ 87    As to emergency work, the Commission did not err in finding that the proposed projects (such as SI and PI projects) were not true emergency projects. It reasonably added $28.5 million to the requested rate base for certain short-cycle projects that it found qualified as work to address true emergency conditions. The Commission's decision to add $28.5 million of Peoples Gas's requested $62.1 million to its rate base to account for emergency work was not against the manifest weight of the evidence. As the Attorney General notes, its technical experts testified that these projects were a mix of unreviewed integrity management and PI projects for which Peoples Gas sought pre-approval and funding to bypass the ordinary rate case prudence review process. The Commission further reasonably found that Peoples Gas's categorization of emergency projects was overly broad.

¶ 88    We also conclude that the Commission's finding that its order would "not modify [Peoples Gas's] options for lawful recovery of adequately supported costs in later proceedings" was consistent with test year principles. The Commission did not adopt, as Peoples Gas argues, a "new cost deferral approach" that "disregards test year principles." The Commission did not defer consideration of work in progress projects or certain ESR projects. It fully considered them in this case. The challenged language did not reflect that the ruling was qualified or limited on the company later seeking cost recovery for the projects. We agree with the Attorney General that the Commission's statement that Peoples Gas can pursue "lawful" cost recovery in a later case does not imply that the Commission would allow the company to unlawfully recover depreciation expense in a later case regarding projects for which it failed to justify recovery in this case. Further, as the Commission notes, Peoples Gas's attorney and its witnesses (Eldringhoff and Salvatore) agreed that, if the Commission disallowed recovery, it *could* seek recovery again in the future. As

to the company's argument that it will not fully recover depreciation costs, this is the consequence of any disallowance based on imprudence, as the Commission notes.

¶ 89    Peoples Gas's argument that the Commission ordered it to continue addressing non-neighborhood SMP work while also denying recovery for it is unavailing. In its final order, the Commission stated that the disallowance applied only to the neighborhood SMP work, and it clarified that the company should continue to address existing and new leaks, as the company had confirmed during oral argument. On rehearing, the company sought $144.9 million for what it now calls, in its entirety, "non-neighborhood" work and which consisted of: (1) $82.8 million in works in progress, which the Commission found the company did not show were prudent and reasonable and disallowed in full; and (2) $62.1 million in its new "ESR" category, which included $33.2 million in SI and PI work that the Commission found did not constitute true emergency work and disallowed, plus actual emergency work for which the Commission allowed $28.5 million in recovery. Peoples Gas, thus, mischaracterizes the Commission's orders, which did not reflect that it ordered the company to continue to address work for which it was denying recovery.

¶ 90    In summary, the Commission did not err in adding $28.5 million to the rate base to address emergencies.

¶ 91                    B. Shops (Peoples Gas)

¶ 92    Next, Peoples Gas argues that the Commission erred in disallowing $236.2 million for the company's new shops and related facilities. The Commission's approach, it contends, is not designed to find a reasonable outcome, but to find a theoretical best possible outcome through a process that identifies all potential alternatives and chooses the one that the Commission, after the fact, deems optimal. Peoples Gas asserts that this has never been the standard. It contends that the Commission's disallowance was erroneous because (1) the Commission abandoned traditional

prudence review in favor of a novel heightened standard; (2) the new prudence standard is more like the least-cost requirements for projects governed by the certificate of public convenience and necessity (CPCN) statute (220 ILCS 5/8-406(b) (West 2022)); however, the shops are *replacement* facilities and never needed CPCNs; and (3) the full disallowance of the shop costs is not supported by the record, and the Commission, in its final order, did not identify a lower-cost alternative.

¶ 93    Peoples Gas contends that the Commission imposed a new list of showings a utility must make before it will deem a prior utility capital investment prudent: a cost-benefit analysis for each facility; a thorough alternatives analysis for each facility; a showing as to why each alternative not pursued was not feasible; an analysis balancing each alternative with other capital investments; and a rate impact assessment for each alternative.  It also directed that, for each required analysis, the utility must include at least five alternatives: repair, refurbishment, replacement, delay, and some combination of these.  Peoples Gas argues that this is an entirely new regulatory approach to prudence determinations for capital investments and constitutes reversible error.

¶ 94    Peoples Gas acknowledges that the Commission explicitly stated that the least-cost standard did not apply to the facilities, but the level of analysis the agency found Peoples Gas should have performed for the shops requires a least-cost determination and much more, including that the utility show why it could not have performed each rejected alternative.  Replacing the traditional prudence standard with complex heightened requirements is *per se* legal error warranting reversal, according to Peoples Gas.  Further, the Commission never afforded the company an opportunity to try and meet its novel standard.  At a minimum, Peoples Gas argues, the Commission should have granted rehearing so that it could present evidence of the type the Commission has now said will govern its prudence review for capital investment projects "of this magnitude."

¶ 95    Finally, Peoples Gas argues that the disallowance of the shops investment was not based on substantial evidence, where the Commission acknowledged that operating the legacy facilities without any improvements would not have been in customers' or employees' best interests, but it eliminated $236.2 million capital investment in total.  The company contends that the evidence showed that all parties and the Commission agreed that the shops needed at least some investment, thus, the Commission's disallowance was unreasonable.  If there was evidence in the record regarding less costly alternatives, the company posits, then that information supported a partial, not full, disallowance.  Peoples Gas also argues that the Attorney General's proposed disallowance rested only on conjecture, where he did not identify any actual less-costly alternatives to the investments the company made and merely insisted that there was a possibility that these alternatives existed.

¶ 96    The Attorney General responds that this court should affirm the Commission's decision disallowing Peoples Gas from adding $236.3 million to its rate base to fund its simultaneous replacement of five shops and facilities and renovation of a sixth because (1) substantial evidence supported its finding that the company failed to meet its burden to show that replacing the facilities in this way was prudent; and (2) the decision applied standard prudence review principles.

¶ 97    The Attorney General contends that the evidence did not compel the Commission to find that Peoples Gas's spending on its shops and facilities was prudent.  The Mortenson report showed that the company could have fixed the issues with the north shop at a cost of $3.9 million, versus the $69.3 million the company sought to replace it.  Walker, the Attorney General's expert, noted that Cushman & Wakefield projected that replacements would result in *higher* total costs than improvements over 20 years, even accounting for the operations and maintenance costs associated with the existing buildings.  Thus, the company's own evidence supported the Commission's

finding that the company was imprudent in failing to take reasonable steps to rule out obvious less-costly alternatives before taking the most extreme approach. The Attorney General further argues that there was no evidence that Peoples Gas even meaningfully considered the repairs Mortenson suggested, much less that it made a reasoned decision to reject any such less-extreme alternatives than simultaneous wholesale replacement. Walker noted that the purported reason for the replacements was to reduce capital and operations and management expenses arising from existing facilities, but Peoples Gas submitted no cost-benefit analysis or other evidence showing that any savings or repairs would have been high enough to balance or justify the outlay for the facilities. The Attorney General notes that the Commission credited Walker's testimony and found that Peoples Gas failed to show the costs it incurred were prudent. He also notes that, as Walker explained, the Mortenson report stated that there were issues at the facilities that resulted from Peoples Gas's own maintenance failures.

¶ 98    The Attorney General further argues that the Commission's imprudence finding and the evidence supported a full disallowance rather than a partial one. Walker, he notes, calculated an alternative disallowance of $66.3 million, however, he stated that the company's insufficient data and negligent maintenance practices made it *impossible* to identify how far the company spent beyond what was necessary to place the facilities in safe working order. The alternative estimate, he further notes, did not account for the possibility of a less costly alternative such as restoring, purchasing, or repurposing existing facilities. Walker also testified that the company provided no analysis comparing the costs of repairing and replacing its facilities and, instead, relied on obsolete or irrelevant reports from years earlier.

¶ 99    Next, addressing the standard the Commission applied, the Attorney General asserts that the Commission applied standard prudence review principles in disallowing costs for the shops

and facilities. He notes that the Commission explicitly noted that the facts in the case before it showed that Peoples Gas did not meet its burden to support its request to recover the costs it sought through the rate base. The Attorney General also asserts that the Commission addressed the company's failure to consider alternative approaches, because the evidence upon which the company relied for its capital spending supported an obvious alternative that it could have pursued at a fraction of the cost in a case where the company sought to raise its rates by 58.1%. He further notes that the Commission pointed out Peoples Gas's lack of analysis balancing its need for the facility replacements with its other capital investments because the company was asked that question in discovery and *refused* to answer. The Attorney General also notes that the Commission expressly declined to adopt a least-cost standard for prudence review and rejected the Attorney General's request to do so. It merely assessed whether the company took reasonable steps before initiating a large-scale capital investment project, which *necessarily* involved asking whether it considered the relative costs of alternative investments. The Attorney General contends that the Commission found, based on the relevant testimony, that Peoples Gas failed to consider an obvious alternative raised in its own reports before initiating a costly project. That finding, he urges, comported with basic prudence-review principles.

¶ 100   Finally, he asserts that nothing obligated the Commission to grant Peoples Gas rehearing, where the company refused to present evidence in the principal case. It further found that the company failed to even hint at what the evidence might be on rehearing.

¶ 101   The Commission, in its response, adds that Peoples Gas identifies no past practice from which the Commission departed or a prior decision involving the construction of new shops or facilities. It also contends that the company's argument that the use of cost-benefit studies is a new regulatory standard is disingenuous, and it points to the company's use of a cost-benefit

analysis to justify its investment in hardware and software upgrades for long-cycle work management and to upgrade its meter reading system. It contends that Peoples Gas misconstrues its order to create a list of required information to argue the Commission took a new regulatory approach to evaluate prudence; it notes that, instead, its finding was that the company's own reports identified less expensive alternatives and that the company did not adequately explain why it did not pursue them.

¶ 102    The Commission further argues that Peoples Gas provides no cognizable basis for a partial disallowance. Walker opined that the company's lack of alternatives analysis warranted a full disallowance, and Weber stated that the 2015 Mortenson report was not valid to calculate the cost of less expensive alternatives. Finally, the Commission argues that Peoples Gas is not barred from future recovery, where it had multiple opportunities to provide an alternatives analysis and cost benefit analysis but declined to do so; and Peoples Gas did not identify any new evidence it wished to introduce in its application for rehearing to establish the prudence of its facilities investment. However, the Commission notes, the company's failure to establish prudence in the docket below does not preclude future cost recovery, as Commission practice permits the company the opportunity to seek recovery of its facilities costs in a future rate case. It provides as an example the exclusion of the company's pension assets from rate base, which it addressed for the fifth time in its order.

¶ 103    We conclude that the Commission did not err in disallowing $236.2 million for Peoples Gas's investments in its shops and facilities. The Commission did not apply a new and unlawful prudence standard. Rather, the Commission explicitly found that the company failed to show that the costs it incurred were "prudent," after considering some alternatives. The Commission *explicitly* acknowledged that "a least-cost standard is not applicable [to] these facilities," and it

noted that the company must consider the cost to ratepayers when it embarks on capital investment, especially when its own report identifies cheaper alternatives. See *Citizens Utility Board*, 276 Ill. App. 3d at 737 ("The Commission cannot fulfill its statutory duty to balance the competing interests of stockholders and ratepayers without taking into account the interests of ratepayers by considering the impact of proposed rates on ratepayers."). It also noted that Peoples Gas did not directly answer a data request that asked, "How did the Company balance the need for its new shops with its other capital investments?" Nor did Peoples Gas address the apparent lack of planning that led to a decision to rebuild all the facilities at nearly the same time.

¶ 104    The Commission's comments related to the "reasonable steps a utility should take before initiating a capital investment project" did not impose a new standard. Read in full, the bases for the Commission's findings were that Peoples Gas did not meet its burden to support its request, where the record was unclear as to whether it considered repairs and upgrades or other alternatives and where it did not directly answer the question of whether it balanced the need for new shops with its other capital investments or address the apparent lack of planning that led it to rebuild all the facilities at nearly the same time. The Commission found that the record was unclear as to whether Peoples Gas considered upgrading and repairing its facilities or other alternatives when developing its strategy to modernize them; thus, this gave the Commission "no insight" into how the company concluded that all five shops and facilities "needed to be replaced immediately." It noted that the Mortenson report identified repairs and upgrades for each shop that could have been pursued to maintain their operations and at a much lower cost than replacement ($3.949 million versus $69.3 million). The Commission also found that Peoples Gas failed to show why it could not have pursued the investments identified in the facilities improvements list in the Mortenson

report to continue operating existing shops, delay the need to build new shops, or pursue some combination of the two.

¶ 105    We disagree that the Commission's approach requires a utility to have made the best possible, as opposed to a reasonable, decision.  To argue that prudence review in this case would not have included an assessment of the repair option (and substantiation of such during its case below) defies logic.  The Commission noted it was unclear from the record whether the company considered upgrading and repairing its facilities.  This was not a case where the company merely eliminated a cheaper alternative.  It provided, as the Commission reasonably determined, no evidence that it even considered it.  The Commission's order did not impose a new standard or reflect hindsight review, but an assessment of the reasonableness of the company's actions at the time they were made.  Further, as the Commission notes, Peoples Gas did provide a cost-benefit analysis to support its $40 million in hardware and software upgrades for long-cycle work management and to upgrade its meter reading system.  Thus, its claim that a cost-benefit analysis is improper is not well taken.

¶ 106   The cases upon which Peoples Gas relies are not helpful to our analysis, because the Commission in those cases explicitly departed from past practice and the imposed change was the basis for its decision.  See *lllinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 435-40 (2003) (reversing the Commission's finding that a present-value-of-revenue-requirement was required for prudent decision-making, where the agency had not required such an analysis in similar situations in the past; Commission departed from past practice; it "decided after the fact that a [present-value] analysis should have been conducted in determining the prudence of an action that had already been taken"); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 180 Ill. App. 3d 899, 906-09 (1988) (reversing Commission's decision to enter an electric utility's

rate schedule based on a calendar year, where, for 10 years prior, the agency had used a 12-month revenue neutralization period rather than a calendar-year period; Commission had "radically altered its past practice regarding the time-frame for analyzing revenue neutrality without notice to interested parties, a hearing, or any readily apparent reason"); see also *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2025 IL App (5th) 240014, ¶¶ 73-87 (vacating Commission's disallowance of a utility's transmission plant capital additions associated with five maximum-allowable-operating-pressure transmission projects it had proposed to place in service, where the utility had provided information in required filings about each project, addressed at length why it chose each method, provided a timeline for its planned reconfiguration, and where the Commission's reduction of budget included work that did not involve work relevant to issue on appeal; where the utility provided the statutorily required information, it was "disingenuous" for the Commission to penalize it "for allegedly failing to meet a standard not previously required" before it issued its decision).

¶ 107   We also reject Peoples Gas's argument that the Commission erred in writing off the *entire* expense, where all parties agreed that it was prudent for the company to spend *something* to improve the facilities.  Peoples Gas does not point to any amount, for example, that it proposed as such an alternative, and the company fails to specify a reasonable alternative amount.  The Commission's determination that Peoples Gas did not act reasonably based on the information available to it at the time was not erroneous.

¶ 108   Further, the Commission credited Walker's testimony on this issue, and we cannot conclude that this was unreasonable.  Walker testified that, without a comprehensive evaluation and cost-benefit analysis, it was premature to accept Peoples Gas's position that constructing new facilities was appropriate.  The level of detail on the alternatives analysis the company provided,

he further testified, was "miniscule," consisting of, for example, " 'complete building renovation is not recommended due to the likelihood of asbestos and other costly environmental materials at the existing facilities.' " (Walker testified that environmental abatement was discarded but had to occur anyway, so the discarding of the renovation scenario was confusing.) The Cushman Wakefield report, he opined, echoed the foregoing, did not contain a detailed cost-benefit analysis of the alternatives, did not provide evidence supporting the dismissal of the repair option, and did not appear to even consider purchasing and renovating an existing building. It also concluded that the new facilities would result in higher total costs over a 20-year timeframe, even accounting for higher operations and maintenance costs for the existing facilities. The McKissack and Paschen reports did not evaluate alternatives, cost reasonableness, operational necessity, or propose any new perspectives. Turning to the 2015 Mortenson report, Walker opined that its primary purpose was to assess the condition of the existing facilities and concluded that, due to Peoples Gas's poor maintenance practices (including failing to repair roof leaks, which led to unnecessary damage) and lack of capital investment, there were compounding condition issues. Although the report recommended replacing several facilities, the report also reflected that the cost of addressing the issues with the existing facilities was far lower than replacing them.

¶ 109 Elder, the public interest organizations' witness testified similar to Walker that Peoples Gas's studies did not rigorously compare cost to ratepayers of constructing new facilities versus the cost to them of refurbishing or renovating existing facilities or any other alternative. Her own operations and maintenance analysis reflected that there would be no operations and maintenance savings associated with the new facilities.

¶ 110 Walker recommended the Commission disallow the recovery of the *entire* cost of the facilities. When asked if he could propose a partial disallowance, he testified that the company's

inability or unwillingness to provide enough data made this *impossible* and that its failure to perform maintenance caused even more concern. Nevertheless, he calculated a $66.3 million partial disallowance (the amount by which the company exceeded Mortenson's estimates of the average cost of replacing the facilities on a per-square-foot basis), but only as a secondary option. He did not account for the responsibility that Peoples Gas bore for failing to properly care for its facilities or that there may have been a cheaper alternative, such as restoring, purchasing, or repurposing existing buildings. We agree with the Attorney General's argument that, given the difficulties of calculating an alternative disallowance based on Peoples Gas's evidence, the Commission did not err in imposing a full, rather than a partial, disallowance.

¶ 111 We also find unavailing Peoples Gas's assertion that the Commission erred in denying its request for rehearing on this issue. The company did not specify what evidence it proposed to present on rehearing, noting only generally that it sought to present "evidence of the type the Commission has now said will govern its prudence review for 'capital investment project[s] of this magnitude.' " As the Attorney General notes, this was especially glaring given that Peoples Gas refused to provide this type of evidence in its principal case. See *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 76 (affirming denial of rehearing; utilities "did not identify this alleged 'new information' or explain how it proved that the rate case expense estimates previously agreed to by the parties were inaccurate. *** [T]heir application for rehearing presented nothing but conclusory assertions. That was not enough to require rehearing based on 'new evidence.' 220 ILCS 5/10-201(e)(ii) (West 2008).").

¶ 112 In summary, the Commission applied the proper standard and its disallowance was not against the manifest weight of the evidence.

¶ 113 C. Clavey Road (North Shore)

¶ 114   Next, North Shore argues that the Commission erred in disallowing $1.689 million for the company's Clavey Road project, which represented 44% of the total project cost. The Commission's basis for the write-off was, the company asserts, its incorrect finding that North Shore failed to justify the prudence of the cost overruns for the project. North Shore contends that the Commission abandoned traditional prudence review by requiring perfection, not reasonableness, in the planning, designing, and estimating stages of a project to overcome a disallowance request. North Shore maintains that it learned of the errors in Highland Park's design plans (which the company relied on to design its facilities) *after* construction began, resulting in the cost variance. Yet the Commission penalized the company and failed to explain why it would be fair to hold the company to a 100% accuracy standard. North Shore also argues that, beyond this arbitrary departure from its past practice, the Commission's finding also disregarded North Shore's substantial unrebutted evidence explaining the unanticipated cost variance, including: the city revising its sewer main design and installing it deeper than originally designed, a water main deeper than shown on the city's drawings and requiring the gas main to be installed deeper than planned, and a temporary storm sewer leaking heavily into the gas pipe tie-in opening that required continuous draining. The company asserts that it was undisputed that these costs were outside its control, thus, the Commission could not have reasonably found that they were imprudent.

¶ 115   North Shore contends that Highland Park's design plans, over which the company had no control, changed and contained errors and ultimately impacted North Shore's plan for its facilities and caused increases in the project's actual cost compared to estimates. Further, it contends that, after it presented evidence supporting the project costs in February 2023, it sought management reauthorization to account for the city's design changes that occurred after the project's approval

and after obtaining contractor bids, which directly led to cost increases. This shows, it argues, that the cost increase was due to unforeseen circumstances.

¶ 116 The Attorney General responds that substantial evidence supported the Commission's disallowance. The disallowance, he contends, reflected the amount by which North Shore exceeded an adjusted industrywide benchmark cost that Walker calculated. The Commission agreed, finding the benchmark to be a standard test method to review reasonableness of costs and a check on both budgeted and incurred costs. North Shore, the Attorney General argues, relied solely on its actual costs without providing a reference point by which to gauge their reasonableness. The Commission, he notes, stated that the company did not provide a timeline of the project, project design, permit review milestone dates, or descriptions of the alleged changes or errors to show that the additional costs were unavoidable. The Attorney General also notes that he explicitly disputed North Shore's assertion that the costs were outside its control. The company failed to present evidence about its coordination with local officials to show the extent to which the revision was unforeseeable, about the diligence it undertook to determine the sub-surface facilities in the area, or who installed the temporary storm sewer and why and what caused the failure.

¶ 117 The Commission responds that it did not apply a perfection standard, where it expressly commented on the company's evidence, the plan changes that necessitated the pipe to be installed deeper than originally planned, and that the temporary storm sewer leaked and required draining. The Commission contends that North Shore conflates actual evidence with witness Eldringhoff's unsupported opinions (*e.g.*, that the plan changes and leaking storm sewers were unanticipated and outside of the company's control). The Commission found that the opinions did not establish prudence, and it noted that North Shore did not provide basic information about the temporary

storm sewer's failure. The Commission also argues that North Shore's evidence was disputed. The Commission notes that it found that the company did not provide sufficient evidence showing the additional costs identified by the Attorney General were unforeseeable or prudently incurred (noting Walker's testimony that the company's explanation was insufficient to justify the discrete costs).

¶ 118 We conclude that the Commission's disallowance for the Clavey Road project was not erroneous. The Commission's decision nowhere reflects that it held North Shore to a perfection, as opposed to a prudence standard, and its resolution of the evidence was not against the manifest weight of the evidence. The Commission determined that North Shore did not provide sufficient evidence showing that the additional costs were unforeseeable or prudently incurred. This finding was not unreasonable. It credited Walker's analysis and noted that North Shore did not provide certain information concerning the project, such as a timeline, project design, permit review milestone dates, or descriptions or dates of alleged changes or errors to justify its claim that the additional costs were unavoidable, unforeseen, and out of its control. The Commission specifically noted as an example of lack of prudence the company's failure to provide basic information about the temporary storm sewer's failure, such as who installed it, why the failure occurred, and what caused it.

¶ 119 Walker proposed a $1.689 million disallowance based on his benchmark analysis, which he testified was a tried and tested method for reviewing costs for reasonableness. He noted that North Shore asserted that the project was unique relative to his benchmark in two respects: it asserted it was a "large sewer project" and involved installing pipe at a greater-than-expected depth. However, North Shore did not provide a discrete cost impact to explain its "large sewer project" reason, and the costs for the additional depth were excessively high at $5.6/mile for a

project on a residential street. The Commission found this testimony credible, and we cannot conclude that its assessment was erroneous.

¶ 120   In summary, the Commission's $1.689 million disallowance for North Shore's Clavey Road project was not against the manifest weight of the evidence.

¶ 121                              D. Rate Case Expense (North Shore)

¶ 122   Next, North Shore challenges the Commission's $1.4 million disallowance for the company's rate case expense, arguing that it unreasonably departed from its past practice and that its decision was not supported by substantial evidence. The company contends that it provided evidence that its attorneys and consultants charged market rates and dedicated a reasonable amount of time to this case, especially considering how many issues were disputed.

¶ 123   North Shore further contends that the Commission failed to evaluate relevant evidence in finding that the company over-redacted legal bills. It notes that it provided less-redacted versions of legal invoices, but the Commission deemed the submission noncompliant without making any findings as to whether the revised bills cured the problem. Its decision, North Shore asserts, focused solely on the initial bills and appears to rest the entire disallowance on that review. And the Commission did not identify a nexus between the disallowance and its noncompliance finding, where the Attorney General complained about bills from one firm (representing $330,000 of the total projected rate case expense in the test year).

¶ 124   The company also argues that the Commission erred in accepting the Attorney General's reasonableness challenges. It notes that the Commission found that its rate case expense was significantly higher than similarly situated utilities and argues that this is untrue in an "absolute sense." North Shore contends that its projected expense was the second lowest of the state's five major gas utilities. Thus, the Commission must have meant that its expense was significantly

higher on a per-customer basis, as the Attorney General argued. North Shore asserts that there is no legal or evidentiary basis for imposing a cost-per-customer cap on rate case expense. The Commission's disallowance limits North Shore to $338,647 to fully prosecute a rate case. The company argues that this is unreasonable, where it is less than the filing fee for the case and less than the funding the company must provide to the intervenors. North Shore also complains that the Attorney General made no attempts to explain how Ameren's case compared to North Shore's in stakes, complexity, or any other factors. It also argues that a cost-per-customer cap disproportionately harms small utilities, because every rate case entails significant legal work irrespective of a utility's customer count. Finally, North Shore argues that the Commission's vague reference to the Attorney General's speculation about duplicative work cannot form the basis of its disallowance.

¶ 125    The Attorney General responds that the Commission appropriately reduced North Shore's rate case expense to a reasonable level, where the amount sought was significantly higher than that of similarly-situated utilities and where this case was a straightforward consolidated rate case with a single test year. He also argues that the company's documentation was inadequate to show the reasonableness of its expenses. The company's less-redacted versions omitted basic information, the Commission determined, and the Commission credited Selvaggio's testimony that North Shore's legal bills included entries for potentially duplicative services. The Attorney General further argues that using Ameren's rate case expense was reasonable because that utility had the highest rate case expense aside from Peoples Gas and North Shore; further, its rate case was far more complex (involving its first multi-year integrated grid plan and first multi-year rate plan) and, thus, using it as a baseline was generous.

¶ 126   In its response, the Commission adds that the issue of redacted documents was not the basis for its disallowance.  Rather, the Commission partially disallowed North Shore's rate case expense because it comprised an inordinately high percentage—18.7%—of the utility's entire requested rate increase.   It also determined that the expert witnesses used by the companies were comparatively more expensive and that there may have been duplicative expenses.  It credited Selvaggio's opinion that North Shore's rate case expense was exceptionally high, where the next highest utility's expense ration was 4% (Peoples Gas) and all other utilities were under 2%.  She also calculated the rate case expense on a per-customer basis, noting that North Shore was the highest at $10.74 per customer per year, followed by Peoples Gas at $2.94, Ameren at $2.09, and ComEd at $0.37.  Selvaggio recommended a reasonableness adjustment using Ameren's figure to arrive at the $1.4 million disallowance, which the Commission adopted.  The Commission further notes that it did not impose a per-customer cap and that Selvaggio opined that the companies' rate cases did not present novel or unprecedented issues.

¶ 127   The Commission further argues that North Shore's argument about the redacted documents is a misdirection.  The billing detail did not alter the 18.7% expense ratio, *i.e.*, it was unaffected by the filed documents, whether redacted or not.  The Commission criticized North Shore for filing heavily redacted documents in violation of its rules, but the infraction was not the basis for its disallowance.  Finally, the Commission notes that, in North Shore's last rate case, docket No. 20-0810, it awarded the company $2.2 million amortized over six years, or $366,700 per year.  That order did not contain any discussion or ruling on a per-customer cap.  The Commission asserts that North Shore offers no explanation as to why its rate case expense ballooned by $1.3 million (from $2.2 million in docket No. 20-0810 to $3.5 million in this case).  The Commission notes that its award in this case—$338,647—is nearly the same as in the earlier docket.

¶ 128 Section 9-229 of the Act provides that "[t]he Commission shall specifically assess the justness and reasonableness of any amount expended by a public utility to compensate attorneys or technical experts to prepare and litigate a general rate case filing." 220 ILCS 5/9-229(a) (West 2022). "Illinois courts have allowed utilities to recover rate case expense because '[t]he costs incurred by a utility to prepare and present a rate case are properly recoverable as an ordinary and reasonable cost of doing business.' *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 432 (1993) (citing *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill .2d 550, (1971))." *People ex rel. Madigan v. Illinois Com. Comm'n*, 2011 IL App (1st) 101776, ¶ 13.

¶ 129 Factors the Commission may consider in assessing the justness and reasonableness of compensation costs, include, but are not limited to: (1) the fulfillment of the required support for compensation costs as required in section 288.110; (2) the identification of the type of service involved as either professional or support staff; (3) the novelty, complexity, or difficulty of the issues; (4) the nature, extent, and reasonableness of work performed that was considered at the time the work was performed, including, without limitation, the amount of support required for pleadings, discovery, briefing, and hearings, and the relevance of the work products to the justness and reasonableness of the proposed utility rates; (5) the requisite skill required to perform services efficiently and accurately; (6) professional credentials, including, without limitation, education, training, experience, achievements, and reputation, in the applicable professional discipline; (7) the reasons why multiple outside counsel, outside technical experts, utility affiliate counsel, or utility affiliate technical experts addressed the same issues; (8) relevant evidence regarding the market rates concerning fees charged for comparable services, including, as applicable, fees charged in other rate cases in Illinois or fees charged in other jurisdictions for rate cases; (9) hourly

rates applicable to outside counsel and outside technical experts representing or retained by utilities and outside counsel or outside technical experts representing or retained by other entities that regularly appear in Commission proceedings; and (10) the reasonableness of the amount of time taken to perform a task. Ill. Admin. Code tit. 83, § 288.110 (eff. Apr. 7, 2023).

¶ 130   We conclude that the Commission's disallowance was not erroneous. We disagree with North Shore's argument that, in a departure from past practice, the Commission imposed a novel cost-per-customer cap and a cap at a certain percentage of a utility's requested rate increase, a departure from which, it asserts, this court owes no deference. The Commission's adoption of Selvaggio's testimony was not unreasonable, and it did not reflect that it imposed any novel caps or departed from past practice. Selvaggio's testimony reflected that she referenced other measures as comparisons to other utilities and to show how North Shore was an outlier in certain respects. We decline to find that this was improper here. Selvaggio also relied on circumstances unique to North Shore (and, where relevant, Peoples Gas) to note why the expenses were high. She also testified that the Companies' rate cases did not present novel or unprecedented issues similar to those presented in the electric multi-year rate cases. The Commission explicitly found that North Shore's projected rate case expense was "significantly higher" than the expenses of similarly situated Illinois utilities and that it was unreasonable for the rate case expense to represent 18.7% of North Shore's proposed rate increase. Selvaggio testified that North Shore's rate case expense exceeded the expenses of each of the four major utilities that filed tariffs in 2023, and the Companies, combined, had fewer customers than any other utility (excluding one). Although North Shore's requested increase was smaller than the other utilities, the Companies, she noted, have the same parent company, adjacent service areas, the same witnesses, similar (if not identical) issues, and the same attorneys; thus, she opined, there should be some economies of scale that

reduce the costs of the rate case for each company. (Further, the two rate cases were consolidated—the companies filed joint rebuttal testimony, staff and intervenor witnesses did not file separate testimony for each company, and briefing would be consolidated.) It was not unreasonable for the Commission to credit this testimony.

¶ 131 Selvaggio also testified that the company's rate case expense had a significant impact on ratepayers, specifically, $10.74 per customer, which was multiple times higher than any other utility. The Companies also appeared to be duplicating efforts. Selvaggio testified that the Companies were the only utilities to utilize multiple law firms for their rate cases and that both utilities' legal fees exceeded 50% of the overall rate case expense, which was higher than all but one other utility. The companies also paid their expert witnesses significantly more than other natural gas utilities paid their consultants. They also paid over $2 million to their parent company, as compared to zero for Nicor Gas and $406,000 for Ameren Illinois' gas rate case. Selvaggio testified that North Shore's $3.5 million rate case expense comprised 18.7% of its entire requested rate increase, which she stated was exceptionally high. The next highest utility's expense to rate increase ratio was 4% (Peoples Gas) and all other utilities were under 2%, with ComEd's ratio being the smallest (0.3%). On a per-customer basis, North Shore's rate case expense was the highest at $10.74 per customer per year, followed by Peoples Gas ($2.94) and Ameren ($2.09; gas), with ComEd being the lowest at $0.37. The foregoing provided proper context from which the Commission could assess the evidence, including information concerning the impact on ratepayers. See *Citizens Utility Board*, 276 Ill. App. 3d at 737 ("The Commission cannot fulfill its statutory duty to balance the competing interests of stockholders and ratepayers without taking into account the interests of ratepayers by considering the impact of proposed rates on ratepayers."). Selvaggio recommended a reasonableness adjustment of $1.4 million, which she

calculated using Ameren's average annual per-customer charge of $2.09 (which was the highest, following the companies). It was not unreasonable for the Commission to adopt her recommendation.

¶ 132   In summary, the Commission's $1.4 million disallowance for North Shore's rate case expense was not against the manifest weight of the evidence.

¶ 133                    E. LTGIP Mandate (the Companies)

¶ 134   The Companies' final argument is that the LTGIP mandate is outside the Commission's authority. They note that certain utilities were required to file biannual integrated resource plans (111 ILCS 5/8-402 (West 1996) (repealed by P.A. 90-561, Art. I, § 18 (eff. Dec. 16, 1997))) and electric utilities must comply with multi-year grid plan requirements (220 ILCS 5/16-105.17 (West 2022)), whereas there are no such explicit requirements for gas utilities. The Companies also assert that the Commission's plenary power under section 5-501 of the Act is limited to doing what is necessary to accomplish the legislature's objectives, not the Commission's agenda. *Id.* § 5-501. Finally, the Companies argue that the Commission's ratemaking authority is governed by Article IX (rates), not Articles V (duties of public utilities accounts and reports) or VIII (service obligations and conditions) of the Act. In ratemaking, the Commission's sole responsibility is to determine the propriety of the requested increase within the regulatory parameters. Here, the Companies argue, the Commission exceeded its Article IX authority by prospectively requiring the Companies to file perpetual biannual LTGIPs, independent of any future rate case filing.

¶ 135   The Attorney General responds that the Commission's order for the Companies to file infrastructure plans was a lawful exercise of its supervisory authority over them, appropriate under the circumstances of this case, and not unauthorized rulemaking under the Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2022)). First, he asserts that the Commission has

statutory authority to supervise all public utilities, including inquiring into the management of their business and doing what is reasonably necessary to fulfill the statutory mandate. It found that, here, imposing transparency measures on the Companies was reasonably necessary to keep the Commission informed of how they are managing their businesses, given their failure to meaningfully respond to questions during discovery. Second, the Attorney General argues that the record supported the Commission's decision because the Companies insufficiently answered questions about how they intended to respond to electrification trends, which raised concerns that they were not working towards State electrification goals and unwilling to factor electrification scenarios into their infrastructure planning. Third, the party-specific remedy imposed in response to the Companies' conduct in this case was not an administrative rule promulgated out of compliance with the notice-and-comment procedures under the Administrative Procedure Act. The *Ameren* decision, the Attorney General further argues, is incorrect.

¶ 136 The Commission responds that section 5-101 of the Act authorizes it to direct the Companies to file LTGIPs where, as here, the Commission requires the information, and that this court should not follow the erroneous *Ameren* decision. See 220 ILCS 5/5-101 (West 2022) ("Every public utility shall furnish to the Commission all information required by it to carry into effect the provisions of this Act"; "[w]henever required by the Commission, every public utility shall deliver to the Commission, any *** reports, documents, books, accounts, papers and records in its possession *** in such form as the Commission may direct[.]").

¶ 137 The Commission

"is an agency 'created by statute and has no general or common law powers.'
*Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 176 Ill. App. 3d 389, 392
(1988). It 'derives its power and authority solely from the statute creating it, and its acts

or orders which are beyond the purview of the statute are void.' *Id.* (citing *Illinois Power Co. v. Illinois Commerce Comm'n*, 111 Ill. 2d 505, 510 (1986)). While the Commission is assigned many functions, including investigative, prosecutorial, advocacy, and decision-making and rule-making roles (see *Alhambra-Grantfork Telephone Co. v. Illinois Commerce Comm'n*, 358 Ill. App. 3d 818, 823 (2005) (citing *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 202 (1989))), its authority is limited to that granted by statute. See 220 ILCS 5/1-102, 4-101 (West 2022)." *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2025 IL App (5th) 240014, ¶ 94.

¶ 138    In *Ameren*, the petitioner appealed from the Commission's requirement that it submit a detailed gas infrastructure plan, arguing that it was outside the Commission's authority. There, the Attorney General and public interest organizations recommended the filing of such a plan, with the latter asserting that the petitioner likely had an internal system plan but the lack of a transparent planning process made it challenging to determine whether the company was prioritizing least cost, least risk prudent investments that were likely to be used and useful. They also noted that long-term gas system planning was critical to considering the State's decarbonization goals and the likely impacts of electrification on natural gas distribution infrastructure and that rate cases were not a sufficient substitute for this type of planning, though long term integrated infrastructure planning could aid the Commission in future rate cases. Other states already require these filings. The public interest organizations also argued that the expected decrease in gas usage in the near future due to the anticipated impacts of electrification on the petitioner's system was the basis for its request for a long-term plan. Such a detailed analysis would align with the State's electrification goals, and this was proper in a rate case because the petitioner's current capital investment

schedules failed to address future electrification and, instead, it was spending money on plants that might not exist in the future. The Attorney General proposed nine items to be addressed for all planned projects and five topics to be addressed regarding completed projects. The petitioner argued that there was no legal authority to mandate an infrastructure gas plan and enacted legislation imposed certain planning requirements on electric utilities but not gas utilities, which could be indicative of legislative intent. Any such plan was also beyond the scope of the petitioner's rate case. The Commission required the petitioner to file a detailed infrastructure plan every two years, identifying 12 topics for inclusion to aid its review of the current and future rate increases. It found authority for its mandate in sections 4-101, 8-501, 9-201(c), and 9-211 of the Act and *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 712 (1997) (holding that, although there was "no express authorization in the Act [to impose a certain penalty], it is a well established rule that the express grant of authority to an administrative agency also includes the authority to do what is reasonably necessary to accomplish the legislature's objective").

¶ 139 The Fifth District vacated the Commission's requirement as void for being outside the Commission's authority. *Ameren*, 2025 IL App (5th) 240014, ¶ 103. It determined that the Commission's requirement was essentially that the petitioner prepare a plan for future rate cases because its mandate did not affect the case before it, where the Commission had already issued its decision in that case. *Id.* ¶ 92. The legislature had specifically required a long-term plan only for electric companies in a statute that elsewhere contained requirements for both types of utilities and explicitly noted it applied to both; thus, the Commission's use of an order in the case at bar was questionable. *Id.* ¶ 93 (referencing Public Act 102-662 (eff. Sept. 15, 2021); codified at 220 ILCS 5/16-105.17 (West 2022) (imposing multi-year grid plan requirements on electric utilities)). The

court also concluded that the Commission did not have authority outside the statute to require gas utilities to prepare long-term infrastructure plans because it would then have been unnecessary to include therein such a mandate for electric utilities. *Id.* ¶ 96. It further determined that, even if it was within its authority, the Commission's mandate was a rule, and the agency could not bypass the rulemaking process, such as public notice and comment requirements. *Id.* ¶¶ 101, 103.

¶ 140 Recently, in *Northern Illinois Gas Co. v. Illinois Commerce Comm'n*, 2025 IL App (3d) 240092, the Third District addressed the same issue, agreed with the court in *Ameren*, and vacated a nearly identical infrastructure plan on the grounds that the Commission exceeded its authority by ordering it. *Id.* ¶ 133.

¶ 141 We come to the same conclusion here. Section 4-101 of the Act tasks the Commission with the "general supervision of all public utilities," including "inquir[ing] into the management of [their] business" and "keep[ing] itself informed" as to how "the business is conducted." 220 ILCS 5/4-101 (West 2022). The Commission also ensures that utilities operate safely (*id.* § 8-501), determines in specific cases whether a utility has met its burden to show the "justness and reasonableness of [its] proposed rates," (*id.* § 9-201(c)), and determines whether certain capital investments for which the utility seeks to recover costs are prudent (*id.* § 9-211). Notwithstanding this broad authority, we agree with the Companies that the Commission exceeded its authority when it ordered them to file LTGIPs. Public Act 102-662 applies only to electric utilities, not gas utilities. As the *Ameren* court noted, Public Act 102-662 need not have been enacted to impose long-term planning requirements for certain utilities if the Commission already had the power to order such plans under its broad statutory authority. *Ameren*, 2025 IL App (5th) 240014, ¶¶ 93, 95-96.

¶ 142    We disagree with the Attorney General that the Commission's order here was a party-specific remedy imposed in response to the Companies' particular conduct in this case—their allegedly insufficient answers to questions concerning how they intend to respond to electrification trends—and was, thus, not an unauthorized promulgation of an administrative rule. We also reject the Commission's related argument that its order is not a statement of general applicability and, thus, it is not a rule under the Administrative Procedure Act. See 5 ILCS 100/1-70 (West 2022) (defining "rule" as "each agency statement of general applicability," but excluding statements *** not affecting private rights and procedures available to persons or entities outside the agency"). The Commission ordered the parties to submit LTGIPs beginning in 2025 and every two years thereafter. Thus, the remedy was not limited to this case; it had broader applicability and was promulgated without compliance with the Administrative Procedure Act.

¶ 143    Also unavailing is the Commission's argument that its broad powers under section 5-101 authorize it to request LTGIPs from the Companies. Section 5-101 addresses a utility's duty to provide the Commission with requested information. *Id.* § 5-101 ("[e]very public utility shall furnish to the Commission all information required by it to carry into effect the provisions of this Act and shall make specific answers to all questions submitted by the Commission"; this includes "reports *** in such form as the Commission may direct"). However, as the Companies note, "the express grant of authority to an administrative agency [ ] includes the authority to do what is reasonably necessary to accomplish the *legislature's* objective." (Emphasis added.) *Abbott Laboratories, Inc*, 289 Ill. App. 3d at 712. Here, the only evidence of the legislature's objective is that gas utilities are not subject to statutes mandating the filing of plans similar to the LTGIPs at issue here.

¶ 144    In summary, the Commission's order that the Companies prepare LTGIPs was void for being outside its authority and is therefore vacated.[8]

¶ 145                                    III. CONCLUSION

¶ 146    For the reasons stated, we affirm in part and vacate in part the Commission's decision.

¶ 147    Affirmed in part and vacated in part.

¶ 148    JUSTICE HUTCHINSON, specially concurring:

¶ 149    I have little to add to my colleague's thorough and thoughtful disposition.  I specially concur to make a minor point.  As we were recently reminded, those seeking to overturn a decision of the Commission must clear a high bar.  Under the manifest-weight standard, it is not enough to " 'show[ ] that the evidence may support a different conclusion; it must be shown that the opposite conclusion is clearly evident.' "  *Concerned Citizens & Property Owners v. Illinois Commerce Comm'n*, 2026 IL 131026, ¶ 27 (quoting *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994)).  I agree with my colleagues that the Companies' evidence in this case did not meet that high threshold.

¶ 150    Further, like my colleagues, I found the decisions in *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2025 IL App (5th) 240014, ¶¶ 92-103, and *Illinois Gas Co. v. Illinois Commerce Comm'n*, 2025 IL App (3d) 240093, ¶¶ 126-133, to be well-reasoned and persuasive.

---

[8]On January 27, 2026, prior to oral argument in this case, the Commission filed an unopposed motion in this court to inform us of its January 21, 2026, reopening of docket Nos. 23-0068 and 23-0069 for the purpose of rescinding its direction to the Companies to file LTGIPs.  It asserted that its decision to rescind its LTGIP order would render moot the LTGIP issue, and a decision by this court on the issue would thereby be unnecessary.  However, as of the filing of this decision, the matter remains pending with the Commission, and no final order has been issued.  In the interest of avoiding further delays in resolving the matters in this appeal, we issue this decision.

At oral argument, I was left with the distinct impression by counsel for both the Attorney General and counsel for the Commission that they realized the gravity of the LTGIP issue and would quickly work to address it. Both attorneys indicated that the long-term planning requirement had been erroneously applied to many non-electrical applicants, and not just the Companies here or in *Ameren*, or *Illinois Gas Co.*

¶ 151   My concern has more to do with fairness. When the Companies had their rehearing before the Commission, roughly six months before the decision in *Ameren* was issued, members of the Commission repeatedly asked about the Companies' long-term infrastructure and planning, which had little to do with the SMPs directly. The Companies were also chided for how they presented their data, and for not sufficiently "disaggregating" the per-project costs of each component of the SMP. It is difficult to separate those lines of inquiry from the now-recognized-as-erroneous demand that the Companies submit a nominal LTGIP. I remain highly skeptical as to *how* the Commission will remedy this problem post-*Ameren*, which would be like "separating spaghetti from the sauce after they had been mixed." *Maslat v. Illinois Workers' Compensation Comm'n*, 2023 IL App (1st) 220003WC-U, ¶ 16.

¶ 152   Due process requires more than just notice and opportunity to be heard; it requires that the hearing itself be fair. What concerns me most here is that applicants in this hugely important and expensive process that helps keep our state running are required to build their rate-requests on the shifting sands of the Commission's and the Attorney General's *non-precedential* interpretations of the relevant statutory authority. There is nothing to prevent these officials from "chang[ing] their minds about the law's meaning at any time, even when [the General Assembly] has not amended the relevant statutory language in any way." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 427 (2024) (Gorsuch, J., concurring). Here, the LTGIP "mandate" is a perfect example

of overreach. It was an additional "requirement" that seems to have been both broadly imposed and poorly conveyed, all in derogation of the safeguards attendant to notice-and-comment rulemaking, or even an amendment by the people's elected legislators. There is in no small sense a quasi-judicial and fact-finding component to the Commission's work as well as the Attorney General's role in those proceedings. I would strongly encourage their "judicial restraint," by which I mean a closer adherence to the statutory text and the clearest possible communication to applicants of what information the Commission and staff require (and how "disaggregated" it ought to be) *before* having to *rehear* a case. I would submit that if the Commission and the Attorney General " 'construe the law with '[c]lear heads *** and honest hearts,' not with an eye to policy preferences that had not made it into the statute" (*Loper Bright*, 603 U.S. at 403-04 (quoting 1 WORKS OF JAMES WILSON 363 (J. Andrews ed. 1896)), these hearings would be more direct, less costly, less time-consuming, and more efficient. Accordingly, I specially concur in the judgment.